```
 1            IN THE UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF MISSOURI
 2                   WESTERN DIVISION

 3   ADRIAN DUNN,                  )
                                   )
 4            Plaintiff,           ) No.  16-CV-00493-BCW
                                   )      July 18, 2017
 5            v.                   )      Kansas City, Missouri
                                   )      CIVIL
 6   UNITED STATES OF AMERICA,     )
                                   )
 7            Defendant.           )

 8

 9          TRANSCRIPT OF EVIDENTIARY HEARING
          BEFORE THE HONORABLE BRIAN C. WIMES
10               UNITED STATES DISTRICT JUDGE

11    Proceedings recorded by electronic voice writing
               Transcript produced by computer

12

13

14                      APPEARANCES

15   For Plaintiff:      MR. BRENT DWERLKOTTE
                         MR. ANDREW CARPENTER
16                       Shook, Hardy & Bacon LLP
                         2555 Grand Blvd.
17                       Kansas City, Missouri 64108

18

19
     For Government:     MR. JAMES CURT BOHLING
20                       Assistant United States Attorney
                         400 East 9th Street
21                       Kansas City, Missouri  64106

22

23

24

25
```

1                          I N D E X

2

3      Description                                      Page

4      Mark King
       Direct Examination by Mr. Bohling:               41
5      Cross-Examination by Mr. Carpenter:              68
       Redirect Examination by Mr. Bohling:             118
6      Recross-Examination by Mr. Carpenter:            131

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
                    E X H I B I T S

Description                            off'd    adm't

Government's Exhibits

Government's Exhibit No. 6             60       60
Government's Exhibit No. 7             61       61
Government's Exhibit No. 8             62       62
Government's Exhibit No. 9             63       63
Government's Exhibit No. 10            64       64
Government's Exhibit No. 11            64       64
Government's Exhibit No. 12            65       65
Government's Exhibits Nos. 14 and 15  67       67


Plaintiff's Exhibits

Plaintiff's Exhibit No. 23            106      107
Plaintiff's Exhibits Nos 24 - 28      109      109
</pre>

1          July 18, 2017

2          (Proceedings began at 9:00 AM)

3          THE COURT:  Good morning, counsel.  Let the Court

4    call the case.  This Adrian Dunn versus United States of

5    America.  Case No. 16-CV-00493.  Can I have parties enter

6    their appearance for the record?

7          MR. DWERLKOTTE:  Good morning, Your Honor.  Brent

8    Dwerlkotte from Shook Hardy on behalf of Mr. Dunn.  Along with

9    partner from Shook Hardy, Andy Carpenter, head of our

10   appellate group.  And also with us is Anna El-Zein who is a

11   law student from the University of Missouri.

12         THE COURT:  Okay.  Great.  Good morning.

13         MR. BOHLING:  Good morning, Your Honor.  James

14   Bohling for the United States.  Joining me at counsel table is

15   Philip Hiscock.  Phil is an ATC attorney with customs and

16   border protection in Chicago, Illinois.  And also my paralegal

17   Erica Curp.

18         THE COURT:  Okay.  Good morning.

19         Well, let me start here.  I know there was some

20   filings that occurred.  I was out last week and there was some

21   filings.  Did you want to take up any preliminary issues?

22         MR. DWERLKOTTE:  Your Honor, if I may?

23         THE COURT:  Yes.

24         MR. DWERLKOTTE:  Permission to approach the podium?

25         THE COURT:  Please.

Denise Carroll Halasey CCR, CVR-CM

1          MR. DWERLKOTTE:  This case is fairly complex so if I

2    could have just a couple minutes?

3          THE COURT:  Sure.

4          MR. DWERLKOTTE:  I think it might help explain a few

5    things.

6          We are here today, Your Honor, whether Mr. Dunn is

7    entitled to return of property that was seized from him over

8    eight years ago.  If this thing will work here.  Probably not.

9    Okay.

10          Last week, Your Honor, it became -- my apologizes.

11    We will figure this out here.  Just one moment.

12          THE COURT:  Okay.  And my apologizes.  Are you all

13    hearing that?  I'm not quite sure what that is.

14          MR. DWERLKOTTE:  That's what messed up my

15    PowerPoint.

16          THE COURT:  Is that right?  I'll go with that.

17          MR. DWERLKOTTE:  There we go.

18          THE COURT:  Okay.  We'll be fine, Joella.  We'll

19    just push through.  Okay.  Mr. Dwerlkotte.

20          MR. DWERLKOTTE:  Sorry about that, Your Honor.

21          Last week we got the impression that we were going

22    to see a lot of testimony and evidence at least in our opinion

23    was inadmissible for a couple reasons.  And in the filing

24    yesterday we see that the government intends to rely on quote,

25    unquote, reliable hearsay, to attempt to meet its burden in

1    this case today.  The government --

2              THE COURT:  --  what is the burden?  Is that a

3    preponderance?

4              MR. DWERLKOTTE:  I would argue, yes, Your Honor,

5    under CAFRA I think it is preponderance of the evidence.  The

6    government bears that burden.  We'll kind of circle back

7    around to that if that is okay with you?

8              THE COURT:  Sure.

9              MR. DWERLKOTTE:  What the time government hasn't

10   told you that most of the evidence that they are going to rely

11   on is testimony and other statements that were made by

12   criminal defendants in the underlying criminal case,

13   particularly Mr. Corredor who was the main subject of the

14   criminal case and who eventually pled in return for the

15   government taking the death penalty off the table for some

16   murders that he was involved in.  So that is the evidence that

17   we think that they are trying to bring in here.  But I think

18   it is also important to kind of understand why we are here

19   today, that we have to see where we came from.  It's kind of

20   long winding history so I'll try to explain that very briefly.

21             Mr. Dunn had his property seized in 2009, June of

22   2009.  More specifically, he had a 1974 Caprice, a 2005

23   Corvette, and $41,000 that was located in the trunk of the

24   1974 Caprice.  Now, to complicate matters there were -- the

25   Caprice and the $41,000 -- I have a little demonstrative that

1   I think kind of helps me at least, identify the property and

2   where it was seized from.  So the $41,000 and Caprice were

3   located at 8717 Kentucky address.  While the 2005 Corvette was

4   located at the 98th Street address.  And red there is the

5   items that we are here about today, Your Honor.

6        So after the property was seized the administrative

7   agency begins the process of sending out administrative

8   notices for forfeiture.  In the meantime the government files

9   a superseding indictment of August of 2009 that includes the

10   same property that we are here today about.  The Corvette, in

11   the underlying case which is 9-188.  So this is August 20th,

12   of 2009.  Mr. Dunn makes a series of filings that the

13   government has conceded should have been construed as claims

14   in the administrative process, but were not.  Typically, the

15   way that that is handled, if a claim is made it gets referred

16   to the US attorney's office, who then is responsible for

17   filing a -- including the property in an indictment or

18   initiating civil forfeiture proceedings rather than

19   administrative forfeiture proceedings.  So Mr. Dunn makes

20   those filings.  They sell the Corvette in 2009.

21        THE COURT:  Whose they?

22        MR. DWERLKOTTE:  Well, Homeland Security, CBC.

23        THE COURT:  Oh, government.

24        MR. DWERLKOTTE:  Yes.  If it's okay, I'll just use

25   the word government?

Case 4:16-cv-00493-BCW  Document 50  Filed 08/28/17  Page 7 of 176

1          THE COURT:  Sure.

2          MR. DWERLKOTTE:  This chart may help a little bit

3    too.  I have a binder up there for Your Honor, as well.  It is

4    Demonstrative Exhibit No. 1 in case you have any questions

5    about it.

6          So they sell the Corvette.  In December of 2009, the

7    criminal case goes to trial with Mr. Dunn and several other

8    codefendants.  In February of 2011, Judge Laughrey tried the

9    case.  It goes on for a series of about a week and the net

10   result is that Mr. Dunn and others are found guilty of a

11   conspiracy to distribute cocaine and were sentenced

12   thereafter.

13         Importantly, Your Honor, the government did not

14   include that property that was included in the indictment as

15   part of the criminal case.  So the Jury didn't make that

16   determination.  After that, the government then realizes they

17   didn't that in the criminal case and initiates the declaration

18   of forfeiture in the administrative process and sells the

19   Caprice.

20         So following that Mr. Dunn files a motion to vacate

21   under 983(e) which is essentially what they did here.  But it

22   was in the criminal case and it should have been a civil case.

23   Now we are here today under 983(e) for -- well, at least this

24   case is here, Your Honor, by virtue of 983(e) which allows the

25   Court to set aside its civil forfeiture, which includes either

1    judicial forfeiture or administrative forfeiture.

2           The government in its brief had conceded that the

3    forfeiture itself was wrong, but nonetheless, wanted to

4    contest the right of Mr. Dunn to the return of his property on

5    the theory that it was traceable or were proceeds from the

6    drug trafficking for the underlying --

7           THE COURT:  -- let me stop because this is going to

8    help me out.  How would we normally do this?  I think I have

9    an idea in my mind how we normally do.  We've got criminal

10   case files, simultaneously filed a motion, a preliminary

11   forfeiture, is that how?  And then what happens -- and correct

12   me if I'm wrong.  And then we go plead guilty, found guilty

13   then we ask for finalization of the preliminary order of

14   forfeiture or we do that at the sentencing.  How is the normal

15   process?

16          MR. BOHLING:  That would be a normal process.  I

17   would just amend that to say that it is not uncommon for an

18   agency to start an administrative proceeding and have that

19   open during the pendency of a criminal case.

20          THE COURT:  Okay.

21          MR. BOHLING:  And it is also not uncommon for us to

22   abandon the criminal forfeiture proceedings.  It's really

23   improper for us to forfeit it twice.  So in the normal course

24   of events you would see that in some cases, we will ask the

25   Court not to complete the criminal forfeiture because the

1    agency has completed an administrative forfeiture.  That's

2    what we believed had happened here.

3            THE COURT:  Who determines an administrative

4    forfeiture from a criminal forfeiture?  What is the rational?

5            MR. BOHLING:  One is a civil proceeding.  An

6    administrative forfeiture is a considered to be a civil

7    forfeiture proceeding.  As the Court knows we sometimes file

8    civil judicial cases that are parallel to our criminal cases.

9    Actually we do that quite commonly now.  So they are actually

10   two different tracks.  And the administrative case is often

11   started first.  And it would be unclear to us, without getting

12   into details, there are so differences between the two

13   processes that we might determine.  So administrative is

14   certainly more efficient.  So if no one files a claim in a

15   timely way in the administrated process, it is essential done.

16   And so we don't have to then spend the Court's own resources

17   on criminal forfeiture if the item is already forfeited.  And

18   so that's what we thought had happened here and obviously,

19   later, as Brent has pointed out, we later, many years later

20   determined that it had not been properly done.

21           THE COURT:  Okay.  Mr. Dwerlkotte.

22           MR. DWERLKOTTE:  So the government, as Curt just

23   pointed out, notes that the administrative forfeiture should

24   be set aside.  And the only way that it would be proper to do

25   that is under 983(e).  I've provided a copy to your law clerk

1    and to you as well, Your Honor.  I think we all agree on that.

2    Normally, that's a provision under CAFRA, which is the Civil

3    Asset Forfeiture Reform Act.  I'm gonna call it CAFRA.  The

4    government here requested a Rule 41 type hearing.  So a couple

5    reasons why we do not believe that Rule 41 applies.  The most

6    logical reason is we didn't file a Rule 41 motion.  Mr. Dunn

7    has not invoked Rule 41 yet, so we don't think that the

8    procedures for Rule 41 should apply here.

9            Secondly, Your Honor, Rule 41 is essentially allows

10   the Court to act -- exercise jurisdiction and exercise equity

11   and only in exceptional circumstances.  Plenty of case law,

12   that I can provide Your Honor a copy if you would like, tells

13   us that Rule 41 is not the proper mechanism to set aside or to

14   deal with property that has been seized through a civil

15   forfeiture but rather it is through CAFRA.

16           Third, we know Rule 41 only applies to the return of

17   property.  Well, we know that the government has sold the

18   Caprice and has also sold the 2005 Corvette.  So there is

19   nothing for them to return to us.  So Rule 41 wouldn't really

20   get us anywhere because they can't give it back to anyway.  I

21   don't know about the money, I presume that they still have

22   money somewhere.  But that hasn't been addressed.  So Rule 41

23   doesn't help us out there so it shouldn't apply.  And even if

24   Rule 41 did apply, Your Honor, I'm not aware of any case law

25   saying that the rules of evidence would not still apply and

1   the proceeding, such that inadmissible hearsay and other

2   evidence should only come in subject to the Court finding that

3   it meets the admissible standard. I would also point out,

4   Your Honor, I have an Eighth Circuit case, Jackson versus

5   United States, 526 F3d 394. This kinda frames the background

6   of why, how we got here. If I may approach, Your Honor?

7            THE COURT: You may.

8            MR. DWERLKOTTE: So typically if there is a Rule 41

9   hearing initiated after the criminal case, we provide the case

10   law in our trial memorandum where it talks about the burden

11   shifting to the government and it is a higher burden. But

12   also the Jackson V. US case, talks about a Rule 41(g) motion

13   is properly denied if the defendant is not entitled to

14   unlawful possession of seized property. The property is

15   contraband or subject to forfeiture or the government's need

16   for the property as evidence continues. Here the only

17   provision of that that applies to this case would be subject

18   to forfeiture. The only way the property can be subject to

19   forfeiture is through administrative forfeiture or civil

20   forfeiture which leads us back to CAFRA.

21         So the government wants to prove that its proceeds

22   are traceable to drug trafficking they have to do that through

23   CAFRA, despite the fact that they have asked for a Rule 41

24   type hearing here today.

25            THE COURT: Let me make sure I'm following. So

1  you're saying they can't do it through Rule 41?

2          MR. DWERLKOTTE:  Yes.

3          THE COURT:  Connect that for me because I'm not --

4          MR. DWERLKOTTE:  -- sure.

5          So Rule 41 wouldn't apply yet.  I think there is

6  Eighth Circuit precedent that tells us that if an

7  administrative forfeiture is set aside as void or is

8  ineffective, the Court should order the government to either

9  return the property or initiate civil proceedings.  That is

10  also in our trial brief.  US Volanty.  So we know that that is

11  the procedure that should be followed.

12          The only way Rule 41 would apply as if the

13  government did not file a civil forfeiture action or a

14  judicial -- I'm saying civil forfeiture meaning they would

15  have to file in federal court.  Would be if they didn't do

16  that, we would have no other remedy but to ask the Court for

17  the return of property in that sense.  But it doesn't apply

18  here yet, Your Honor, because the Eighth Circuit tells us what

19  the normal procedure would be in this circumstance.

20          Finally, I will get to what is CAFRA?  CAFRA, I have

21  an evidentiary brief as well as trial brief that kind of gives

22  some background on this.  But in 2000, Congress enacted CAFRA

23  in order to consolidate and dramatically overhaul the

24  procedures for civil judicial forfeiture proceedings.  One of

25  the main things they did, Your Honor, was require the

1    government by a preponderance of the evidence standard to show

2    that the property is subject to forfeiture.

3              Importantly as well, Your Honor, we have cited cases

4    from the only Circuit Court that has determined the issue, as

5    well as other circuit courts around the country, as well as

6    some in the Eighth Circuit that have found that the rules of

7    evidence apply to CAFRA cases.  And I'm going to let -- Andy

8    will handle more of the admissibility arguments that we have.

9    But I wanted to point out that the rules of evidence certainly

10   apply under CAFRA, and that was one of the major reasons for

11   the enactment of CAFRA in the first place.

12             So for that reason, Your Honor, we would ask that --

13   we go through this hearing today, we apply the normal rules of

14   evidence, and we will see how it plays out.

15             THE COURT:  Okay.  Mr. Bohling, would you like to

16   respond?

17             MR. BOHLING:  I would, yes.

18             Your Honor, this is indeed a complex and fascinating

19   case, and I actually agree with counsel on many points, but

20   there are some where we diverged, and I would like to explain

21   those differences.

22             As counsel has noted the agency, Customs and Border

23   Protections, started administrative forfeiture proceedings

24   back when this case was in process which would be about 2009,

25   going through to 2011.  And they did enter final orders of

administrative forfeiture as to the three assets in question.

The $41,000, the Corvette, and the Caprice. Mr. Dunn, has

made a series of filings over the years. Finally culminating

in the one that I think was properly filed. After visiting

with the agency and talking about we did indeed determine that

the agency, that the -- what we call FP&F officer, the

individual who is in charge of this, should have interpreted

Mr. Dunn's filings with the agency as claims. And just for a

little background on that. There are two different processes

that go on here and that's why it gets a little confusing.

There is a claim, which requires the agency to send the case

over to my office for judicial forfeiture action potentially.

And then there is something called a petition for omission,

which is essentially the person asking the agency in its

discretion to not forfeit the items. The FP&F officer

interpreted Mr. Dunn's filings as a petition for omission,

which they may have been, but they also to us should have been

interpreted as a claim.

So that brings us to then the, the framework that we

think applies to this case. And I think it is actually a

three part framework. And I certainly agree with counsel that

the first part of that is 18 U.S.C Section 983(e). That is

the provision of CAFRA that allows for judicial review for

administrative forfeiture, final administrative forfeiture

actions. That provision does not allow for a substantive

1  appeal or a substantive look at what happened.  It looks at

2  the procedure.  Usually that procedure has to do with

3  noticing.  And while there are some little noticing blips

4  here, this primarily is not a noticing case.  But as we point

5  out in the briefs that we filed with the Court, a number of

6  courts have broadened the scope of 983(e) to approve cases

7  like this, where the agency misinterpreted essentially the

8  filings of the claimant, here Mr. Dunn's filings, and have

9  allowed 983 to apply essentially as a due process violations.

10  And again, the government has conceded that this is an issue.

11  That the administrative forfeiture should be undone by the

12  Court.  Now, we would note for the record, I don't believe

13  that has happened yet.  I don't think the Court has yet

14  entered an order under 983 formally vacating the

15  administrative forfeitures.  But I'm sure it will at some

16  point, an appropriate time during the proceedings giving our

17  concession, but that does become an important point down the

18  road.

19          So the next question is --

20          THE COURT:  Okay.  So that's good.  Now, I'm kind of

21  following this.  Now, I've got an idea.

22          So let me ask you this, so ultimately the question

23  -- and I don't know if this is right because ultimately the

24  Court will vacate?

25          MR. BOHLING:  Correct.  I assume.

1          THE COURT:  Now the question becomes --

2          MR. BOHLING:  -- what happens?

3          THE COURT:  What happens?  Where do we go from here,

4     what can we do from here, right?

5          MR. BOHLING:  And there are different ways that this

6     can go.

7          THE COURT:  And I'll let you go, Mr. Dwerlkotte.

8          MR. BOHLING:  Now, Mr. Dwerlkotte has given you a

9     case that talks about filing a civil forfeiture action.  And I

10    agree that if we were in the statute of limitations that would

11    be the way that this would go.  That once the Court entered an

12    order vacating the administrative forfeiture, that the law

13    suggests that we have the right to file a civil forfeiture

14    action at that juncture.  The problem we have quite honestly,

15    and we have told the Court and counsel, we are way outside the

16    statue of limitations.  These things happened in 2008 and

17    2009, we're in 2017, it is a five year statute.  So that

18    obviously creates a barrier to us filing a new civil

19    forfeiture proceeding.  And I would say that was probably not

20    an issue in the Eighth Circuit case that was cited to you.  So

21    I agree completely that if we were in the statute, that is

22    absolutely the way to go.  That is what the Eighth Circuit

23    says, that is what most courts say is that we would file a

24    civil forfeiture proceeding.  And that would mean we would

25    literally have to file a civil forfeiture complaint as I'm

1    sure the Court has seen us file many times.  Which we could do

2    in short order, that is not an issue, but it is an issue that

3    is out of time.  And so that did not seem to be the answer on

4    these particular facts.

5         The next -- so the body of law that we are citing to

6    the Court which is the United States versus Clymore, I think

7    is the chief case.  And then Clymore 2, and a number of other

8    cases we have cited, suggest that in this situation where the

9    administrated forfeiture has been vacated, and the statute of

10   limitations on the civil forfeiture complaint is run, that is

11   when Rule 41 becomes operative.  Because essentially the

12   government is holding the property, we don't have the right to

13   file a civil forfeiture case because the statute has run, and

14   now if the claimant wants the property back, in this case

15   Mr. Dunn, Rule 41 is the only procedural mechanism out there.

16        Now, just to speak to why I asked for this hearing,

17   it was really out of a sense of this has taken a very long

18   time.  And it would be fair to say that Mr. Dunn has filed

19   Rule 41 motions.  He's filed just about every motion that one

20   can imagine.  They just were out of sequence.  And as the

21   Court can see sequencing is very important in this.  So he had

22   filed Rule 41 motions in the past but the problem was they

23   were premature because the items still remain forfeited.  So

24   he can't get them back while they are forfeited.  But once the

25   Court undoes the forfeiture, he certainly can ask for them

1    back.  So the reason I asked for this hearing was really out

2    of efficiency.  It was because we have taken a very long time,

3    I do have a sense of fairness about this, it was our mistake.

4    I can see that.  And so I was trying to get to the finish line

5    a little faster, that is all.  And really it is up to them as

6    far as -- it could be that we wait for the Court to enter the

7    order formally, and then we can announce to them that we are

8    not going to file a civil forfeiture because we believe we are

9    out of time to do so.  They can file the Rule 41 and we can

10   come back, but we are here so I'm certainly okay with going

11   ahead with the hearing.  I suspect that is their position as

12   well.  But I do think this has to be a Rule 41 hearing under

13   the law and under the procedural posture of the case which is

14   somewhat unique.

15          So under Rule 41 there is a line of cases that

16   says -- with Clymore, there is a case called Penrey, which I

17   think puts it very well, that says, when the property is used

18   to commit the offense on which the defendant received his

19   conviction, only an innocent owner or one agreed by the legal

20   seizure may qualify for lawful possession of the property.  So

21   the law recognizes that there is an equitable element to Rule

22   41.  And while Mr. Dunn could request his property back, we do

23   have a right to present evidence to the Court that that would

24   not be equitable.  And in this case our argument obviously is

25   going be that Mr. Dunn has been convicted of a major drug

1    conspiracy and that these items were involved in that

2    conspiracy.

3            Now, as to the evidence issue, I think that is an

4    interesting issue.  For the most part, I believe we will be

5    able to provide the Court with non-hearsay competent evidence

6    of the points we are trying to make.  There is one item -- we

7    did not bring Mr. Corredor here, that is absolutely true.  So

8    there is one item where I would propose to call a witness for

9    a very short recitation of what Mr. Corredor said in a

10   proffer.  I would like to be allowed to make that as an offer

11   of proof.  And I have researched this Rule 41 issue, it is not

12   clear to me that this issue has been resolved as to whether

13   competent hearsay in a reliable hearsay evidence is

14   admissible.  But I think there is only one piece of evidence

15   --

16           THE COURT:  -- is that always the case though?

17           MR. BOHLING:  In a motion hearing I think it would

18   be.  I mean, I think I have a good argument that that is true.

19   And what I did see is that in many of the cases --

20           THE COURT:  -- it goes to the essence of

21   reliability.  Isn't that why we have the hearsay rule?

22           MR. BOHLING:  Right.

23           THE COURT:  Because you want to make sure.  And

24   that's why we have these exceptions to the hearsay because of

25   the reliability.

1          MR. BOHLING:  Right.

2          THE COURT:  So if arguably, I mean, I'm sure

3    Mr. Dwerlkotte may object, but your argument would be --

4    right?

5          MR. BOHLING:  Right.  And I do think I do have

6    arguments for why this might be admissible in a regular

7    contexts.  But I believe that in for the most part we can

8    avoid getting into that.  And I'm not sure it's necessary that

9    the Court -- I mean, I don't see a huge issue when looking at

10   the trial transcript.  I mean, it's the same party, it's

11   subject to cross-examination.  I think all those things are

12   true.  But I certainly think the Court can find its way to see

13   our point without having to rely on such evidence.  So I'm

14   confident with that.

15         THE COURT:  Okay.

16         MR. BOHLING:  Now, there is a third part of this

17   which is -- it gets very complicated and very interesting.  As

18   counsel pointed out the agency has sold the Corvette and sold

19   the Caprice.  And I agree with him that Rule 41 in the Eighth

20   Circuit cannot reach those items.  We no longer have them

21   physically.  So you can't return what you don't have.  That's

22   generally the law, that's certainly the law in the Eighth

23   Circuit.  So where do we go from here?  The seminal case here

24   in the Eighth Circuit and important case nationwide is a case

25   call Hall.  Which we have cited, it's 269 F.3d, 943.  And in

1    Hall the Eighth Circuit said that Rule 41 does not -- is not

2    itself a waiver of the government's sovereign immunity.  So

3    Rule 41 is not a way in which a Court can assess damages

4    against the government in this situation, where the government

5    has essentially converted the property.  Rule 41 itself in the

6    Eighth Circuit as it says does not fill the gap.  What the

7    Hall court said is that the District Court is entitled to

8    treat the Rule 41 motion also as a civil motion for damages.

9    And the reason that it is important frankly is because it gets

10   away from statute of limitations issues that might actually

11   exist here.  So that is important.  But it is incumbent upon

12   Mr. Dunn -- well, let me go back a step.  I think there are

13   two parts to this analysis.  One, is if the Court finds that

14   we are not equitably entitled to return the cars, I think we

15   are done.  I think we don't have to worry about this damages

16   issue.  If the Court finds that as to one of both of the

17   vehicles that we are -- would otherwise have to return them,

18   then we get into this issue of okay, we can't return them, is

19   there a civil cause of action for damages that is available?

20   And I walked through what some of those might be.  We would

21   generally look to the Federal Tort Claims Act.

22            THE COURT:  What?

23            MR. BOHLING:  The Federal Tort Claims Act.

24            THE COURT:  Okay.

25            MR. BOHLING:  The other possibility that people use

1    is the Tucker Act.  And if the Court has done that litigation,

2    you will remember that there is what we call little and big

3    Tucker Acts, less than $10,000, more than $10,000.  If it is

4    more than $10,000 it has to go to the Court of claims.  So

5    this all gets very complicated in post.  But it would be

6    incumbent upon Mr. Dunn to identify a waiver of sovereign

7    immunity and a theory of recovery to the Court before he can

8    recover damages.  I'm not saying it's impossible.  These are

9    excellent lawyers and they may well find that way to do it.  I

10   think can be difficult, but that is their burden and that is

11   what has to happen.  We are a long way from that point but

12   that is the three parts.

13          Now 83 which we have conceded, Rule 41, which we are

14   here to have the hearing on today, and then as to the cars

15   since we all agree the cars have been sold and they are no

16   longer available for return, an appropriate waiver of

17   sovereign immunity and theory of recovery under federal law in

18   order to get damages for the cars being sold.

19          THE COURT:  And that would be only if --

20          MR. BOHLING:  -- only if the Court finds that we

21   have an obligation to return them.

22          THE COURT:  Right.

23          MR. BOHLING:  So that's -- a very interesting case.

24   That's our view of it.  And I appreciate counsel I think they

25   have sought this out very well and I appreciate the

1    discussion.

2           THE COURT:  Mr. Dwerlkotte, it looks like you wanted

3    to say something.  So I'll let you may be addressing what

4    Mr. Bohling said.

5           MR. DWERLKOTTE:  Absolutely, Your Honor.

6           So we've got three ways the government can properly

7    seize and then subsequently forfeit property.  Administrative,

8    criminally, civilly.  All three of those avenues we now know

9    that they don't think that they can do.

10          THE COURT:  There is no avenue to vacate.

11          MR. DWERLKOTTE:  Right.

12          THE COURT:  So we are at ground zero.  Civilly you

13   can't do because the statute has run, correct?  Would you

14   agree or no?

15          MR. DWERLKOTTE:  I don't know, I don't know about

16   that Your Honor.  I haven't talked to my client, but I don't

17   think that I would waive a statute of limitations argument

18   before Your Honor today.

19          THE COURT:  Right.

20          MR. DWERLKOTTE:  For them to go file something.  And

21   we know that it wasn't forfeited as part of the criminal case.

22   So it seems now, they're saying that Mr. Dunn now has the

23   responsibility to file this Rule 41 motion to get it back when

24   they have three ways that they can properly do this, and they

25   didn't do it.

1          THE COURT: And so what do I do? So you're saying

2     -- and that was part of your argument earlier. So they had

3     three ways, and now they can't do any of the ways, is that

4     what you are suggesting?

5          MR. DWERLKOTTE: Right. And so if they were to do

6     the civil forfeiture, file the complaint --

7          THE COURT: -- they say they can't, the statute has

8     run.

9          MR. DWERLKOTTE: They say they can't, then CAFRA

10    would apply. They have the burden, they have to come in, they

11    have to have admissible evidence and our biggest problem here,

12    Your Honor, is not necessarily with Rule 41 applying or CAFRA,

13    so long as the rules of evidence apply. Because what we think

14    they have is a bunch of inadmissible testimony.

15         THE COURT: Mr. Bohling says he can avoid that. I

16    don't know what he plans on putting on, but that's his

17    argument.

18         MR. DWERLKOTTE: Absolutely. So I think that that's

19    -- and Andy can speak more to -- I think they have submitted

20    an exhibit lists and we have challenges to each of those items

21    on various grounds and so we can address that. But I think

22    that it would be improper to shift the burden to Mr. Dunn

23    after the government says we've had all these avenues to

24    seizure property and then to forfeit it. And now we're not

25    going to do it properly, but then make you bear the burden to

1  get it back.  I think that's improper.  I think that the last

2  part about whether their sovereign immunity has been waived, I

3  think we can table that until a determination has been made

4  here on whether the proceeds are --

5          THE COURT:  -- so I guess my question is, if I am

6  understanding, how do we get there?  Because what you are

7  suggesting is it's not a Rule 41 hearing.

8          MR. DWERLKOTTE:  I mean -- I think as long as the

9  rules of evidence apply we can call it whatever we want to

10  call it.

11          THE COURT:  I don't think Mr. Bohling disagrees that

12  the rules of evidence -- but I'm guess I'm having a problem

13  myself with are you opposing that or do you disagree that this

14  should be a Rule 41?  Or you don't care if it's Rule 41,

15  Judge, I just don't want the rules of evidence to apply?

16          MR. DWERLKOTTE:  Right.  Well, with the caveat that

17  I think if it's a Rule 41 setting --

18          THE COURT:  What other way can we do this?  Let's

19  say statute of limitation, the Court will vacate the

20  administrative forfeiture.  Statue of limitations has run on

21  the Civil Forfeiture Act, because normally they would do that.

22  They believe statute of limitation, where are we at then?

23          MR. DWERLKOTTE:  Then they have to give the property

24  back.

25          THE COURT:  You're saying right now they have to

1    give it back?

2           MR. DWERLKOTTE:  Right.  I think that that would be

3    what it is.  And think that the cases Mr. Bohling cites are

4    pre-CAFRA cases.  I think those are interpreting CAFRA before

5    2000 or cases that really didn't meaningfully discuss it.  So

6    I think that those cases no longer apply.  So I think that we

7    either have a hearing in which the CAFRA standard applies.  We

8    agree that CAFRA, the preponderance of the evidence standard

9    applies or rules of evidence would apply.  Or it can be -- I

10   don't think it's a Rule 41, but if it was, the burden would

11   still be on the government and it would still be to prove that

12   it's traceable proceeds of drug trafficking by essentially the

13   same standard.  But I think it -- again, we agreed to the

14   hearing on the bases that it would be more efficient, it's

15   easier, it's been over eight years, we might as well get it

16   over with.

17          THE COURT:  I agree.  I just want the record to be

18   very clear what this Court is doing or not doing.

19          MR. DWERLKOTTE:  Absolutely.  What we would have a

20   problem with then is the ability to not cross-examine most of

21   these people, particularly Mr. Corredor, so it would be a very

22   short hearing full of evidence that can't really refute

23   because nobody is here.  And we certainly didn't have an

24   adequate opportunity to attack these items as part of the

25   criminal case because it wasn't submitted to the Jury, they

1    weren't instructed on it, and a lot of it didn't come in in

2    the criminal case, Your Honor.

3              THE COURT:  Okay.  Would you agree -- so my

4    understanding of this Rule 41, it is a role that is -- it's a

5    rule of equity, is that what you are suggesting?

6              MR. BOHLING:  Yes, Your Honor.  I believe the only

7    way that we can have a hearing today is under Rule 41.  We

8    haven't filed the civil forfeiture case.

9              THE COURT:  You haven't filed that.

10             MR. BOHLING:  Right.

11             THE COURT:  And then I would have to determine the

12   statute of limitations, you know, and --

13             MR. BOHLING:  -- we would have to file a complaint

14   and go through that.

15             THE COURT:  Right.

16             MR. BOHLING:  And the cases that we cite and I think

17   generally the cases suggest that in this situation Rule 41

18   becomes an equitable rule and the Court can deny the return of

19   the property to someone like Mr. Dunn who we allege was

20   involved in a drug conspiracy and we would allege -- and I

21   agree with counsel's assertion that it is all burden of proof

22   by preponderance to show you that these assets were involved

23   in this drug conspiracy.

24             THE COURT:  And that is how you make your equitable

25   argument.  Equity would suggest that you don't return them.

1          MR. BOHLING:  Right.

2          THE COURT:  Because of this involvement within the

3     criminal activity.

4          MR. BOHLING:  It's our burden and we have no problem

5     with that.

6          THE COURT:  Yeah.

7          MR. DWERLKOTTE:  And I would just counter that

8     equity I don't think post-CAFRA in 2000, has a meaningful role

9     in the Court's analysis of whether he gets it back.  It is

10    either they have to initiate civil proceedings, and if they

11    can't, they have to give the property back.  I don't think --

12    equity here doesn't demand that the Court exercise

13    jurisdiction because they just give us the property back.  And

14    the government would then have the burden to say that this

15    isn't right, and we should now have the hearing.  It is not on

16    Mr. Dunn to say, hold up, let's have this hearing because the

17    government is out of time to file this.  They've got it

18    backwards.

19         MR. BOHLING:  My only point is I think actually the

20    majority of the cases that we cite on this this point are

21    post-CAFRA.  There is 2011, 2013, for example.  While Clymore

22    I think it kind of straddles between pre and post CAFRA.  I

23    think the case law that is developed since then is post-CAFRA.

24         MR. DWERLKOTTE:  All except the Babb case which I

25    don't think meaningful addresses the CAFRA, post-CAFRA

1  distinction.  Are all cases that involve searches and

2  forfeitures before 1999.  So pre-CAFRA standards would apply.

3       The more recent cases that we have cited in our

4  trial brief, Your Honor, are cases that in the normal

5  situation where the government does file a proper civil

6  forfeiture case, you kind of go through what we have laid out

7  in CAFRA and how that burden applies to the proceedings.  It

8  would essentially be another civil case where you would have a

9  right to a jury trial and everything like that, we just agree

10  that we would have Your Honor decide the issue here rather

11  than go through that whole process later.  Efficiency, Your

12  Honor.

13       THE COURT:  I know about efficiency.  I'm just

14  trying to the best I can articulate for the record so I don't

15  have this issue coming back to Division Three.

16       MR. DWERLKOTTE:  Right.  For Rule 41 equity wouldn't

17  demand that you exercise jurisdiction.

18       THE COURT:  I guess your point is this, despite the

19  fact whether we have a hearing based on the civil or the

20  CAFRA, the rules of evidence apply?

21       MR. DWERLKOTTE:  Yes.

22       THE COURT:  And you just simply -- whatever we call

23  this hearing, to short-circuit it all, and to determine that

24  the rules of evidence apply?

25       MR. DWERLKOTTE:  I'll agree to that.

1          THE COURT:  Would that be a fair assessment?

2          MR. DWERLKOTTE:  I don't think Rule 41 applies, but

3     I agree that we are here today to determine that.

4          THE COURT:  So Rule 41 in your opinion again, and

5     then we're going to move on and hear some evidence.  So Rule

6     41 applies in a situation where?

7          MR. DWERLKOTTE:  Extraordinary circumstances, Your

8     Honor.

9          THE COURT:  This is not extraordinary.  Or do you

10    think it is extraordinary based upon them?

11         MR. DWERLKOTTE:  Again, I think it is flipped.  It's

12    not extraordinary for Mr. Dunn because his remedy is the

13    government should give his property back or file the civil

14    forfeiture.  So the extraordinary circumstances that the

15    government can't apparently do that.  So it is not on us to

16    invoke Rule 41.  The government I don't think can, but would

17    have to invoke Rule 41.  So that's why Rule 41 is not

18    applicable here.

19         THE COURT:  Can he argue you asked for Rule 41

20    prematurely, like the government said, and then finally --

21    because arguably until this Court forfeits or sets aside or

22    vacates the forfeiture, then he would file a rule -- he would

23    do, wouldn't he?  If he wanted his stuff back, right?  I

24    thought you told me Rule 41 is a hearing for returning

25    property, correct?

1          MR. DWERLKOTTE:  That's correct.

2          THE COURT:  Wouldn't he ask, hey, give me my

3  property?

4          MR. DWERLKOTTE:  I would agree like the Jackson case

5  that I pointed out earlier is a prime example of when Rule 41

6  would apply.  If the administrative forfeiture component was

7  done correctly, and then say the criminal case then go through

8  with the forfeiture, then, yes, Mr. Dunn would have to file a

9  Rule 41 motion, ask for the property back, and we would have

10  the Rule 41 analysis.  But it is because the administrative

11  forfeiture is being set aside then we don't need to get to the

12  Rule 41.

13          THE COURT:  Because he doesn't have to ask it back,

14  he should just get it back?

15          MR. DWERLKOTTE:  Exactly.  The burden is now on the

16  other side for the government to either give it back or come

17  forward in court with admissible evidence, not inadmissible

18  evidence.

19          THE COURT:  Ah.  It took me a while, but I got your

20  point now.

21          MR. DWERLKOTTE:  It's very complicated.

22          THE COURT:  This is kind of complicated.  I'll give

23  you one last stab at this.  Did you hear -- I mean, why

24  wouldn't we be back at Ground Zero?  Now, you have to -- why

25  is it a Rule 41?  Why does Mr. Dunn have to ask for that?

1          MR. BOHLING:  Well, I think the point that the Court

2     made is the correct one.  We have the property and he has to

3     ask for it back.  We can't return the cars, we don't have

4     them.

5          THE COURT:  Right.

6          MR. BOHLING:  So there is no -- it's not possible

7     for us to return that.  And 983 does not speak to what happens

8     after the administrative forfeiture is undone.  That's a

9     matter of case law.  It doesn't say we have to give it back.

10     So it would be essentially incumbent on Mr. Dunn to file a

11     Rule 41 in order to trigger the process.

12          THE COURT:  The process of returning the property?

13          MR. BOHLING:  Right.

14          THE COURT:  Okay.

15          MR. BOHLING:  Right.

16          THE COURT:  And I've got it now.  This is more of an

17     oral argument than anything else.  That kinda makes sense to

18     me.  If I vacate we're back to this.  And now we have -- they

19     didn't forfeit it, but they do have -- well, they don't have

20     the property but it seems that he's got to ask.  What is the

21     process for Mr. Dunn getting that property?  How do you

22     initiate that?  You don't come in court and say, Judge, I want

23     it back.  Judge, based upon Rule 41, I want it back.  I know

24     they messed up.  I know that I shouldn't have to do it, but

25     what other mechanism is there for you to get that property?

1    Say I agree, 41 doesn't apply, how are you going to ask me to

2    get your property back?

3            MR. DWERLKOTTE:  The Court would enter an order that

4    says you either give him the property back.

5            THE COURT:  On what authority?  Give me authority.

6    I can't just do it because Judge Brian Wimes wants to do it.

7    I need authority.

8            MR. DWERLKOTTE:  Absolutely.  It's Eighth Circuit

9    case, US Volanty.

10           THE COURT:  Volanty?

11           MR. DWERLKOTTE:  V-O-L-A-N-T-Y.  It's 79 F.3d 86.

12           THE COURT:  Okay.

13           MR. DWERLKOTTE:  That says the Court should either

14   require the government to initiate civil proceedings or give

15   the property back.

16           THE COURT:  That's what this case says?

17           MR. DWERLKOTTE:  That's what the Eighth Circuit case

18   says, exactly on point.

19           THE COURT:  So what are the facts then?  Not that I

20   don't believe, but what prompted this?

21           MR. DWERLKOTTE:  Same.  It was a DEA administrative

22   forfeiture that was ineffective, i.e, void.

23           THE COURT:  Set aside and vacated?

24           MR. DWERLKOTTE:  So essentially that it would be, it

25   would then be set aside under 983.

Denise Carroll Halasey CCR, CVR-CM

1          THE COURT:  983 set aside so here we are.  They

2     didn't institute any action to seize it therefore you're

3     saying, hey, you either do that or give the property back?

4          MR. BOHLING:  Sometimes though I have seen it where

5     the government initiates the civil forfeiture before 983(e)

6     vacation has been entered.  But they could have done that,

7     they didn't.

8          THE COURT:  Okay.

9          MR. DWERLKOTTE:  I will also say I think 983 does

10    speak to exactly to this.  I think 983(a)(f)or 983(a)(3)(a)(b)

11    all tell us that if the government doesn't give proper notice

12    that it gives the property back.  And pending either civil

13    filing or some other mechanism.  So the statute itself tells

14    us that Mr. Dunn gets the property back pending the civil

15    forfeiture proceedings.

16         THE COURT:  Okay.

17         MR. DWERLKOTTE:  I think you've got US v. Volanty.

18    And I think you've got 983.

19         THE COURT:  So your saying the Rule 41 mechanism

20    procedural would be if here it is different.  Judge, if you

21    didn't -- so if I didn't set aside, right?  Because that is

22    the difference here.  If we have simply this, if we have this

23    administrative forfeiture that I don't set aside, right?

24         MR. DWERLKOTTE:  Right.

25         THE COURT:  You can ask for it back by Rule 41.  But

Denise Carroll Halasey CCR, CVR-CM

1  here what you're saying is, Judge, we don't have to submit it

2  because you're going to vacate and set that aside?

3          MR. DWERLKOTTE:  Right.

4          THE COURT:  Now, this can't be a Rule 41.  They have

5  got to ask, they have got to initiate either a civil

6  forfeiture administrative or some other remedy to get this, to

7  forfeit this property, otherwise you need to say give him his

8  property?

9          MR. DWERLKOTTE:  Exactly.  And I think that the only

10  way under the facts of our case conceive a Rule 41 motion

11  would be required by Mr. Dunn as if the government didn't want

12  to give him his property back after the Court told him they

13  had to.

14          THE COURT:  How do I normally institute a Rule 41?

15  I guess that is my question.  For Mr. Dunn?  If I am Mr. Dunn

16  why do I use Rule 41?

17          MR. DWERLKOTTE:  You would use Rule 41 in the event

18  that the administrative forfeiture component was done

19  correctly.  Exactly on point with Jackson which is they had

20  certain pieces of property were seized, portions of it later

21  on he came back and said weren't part of the criminal case,

22  but he was able to come back and show that certain pieces of

23  property he had an ownership interest to.  The Court said,

24  okay, you still have it.  Give him his property back.

25          THE COURT:  Or no, he didn't have it.

1          MR. DWERLKOTTE:  Well, the government in that case

2     did still have certain pieces, but for the portions that it

3     didn't then brings up the thing that we have tabled which is

4     the little Tucker Act and Bivens Federal Tort Claim.

5          THE COURT:  Well, what I'm saying is I have to make

6     some determination.

7          MR. DWERLKOTTE:  Yes.

8          THE COURT:  And I can decide well, you didn't have

9     this property, therefore, the full forfeiture is in affect,

10    correct?

11         MR. DWERLKOTTE:  One more time, I'm sorry.

12         THE COURT:  Nothing.  Let's present some evidence.

13         MR. DWERLKOTTE:  All right.  Admissible are

14    inadmissible?

15         THE COURT:  I think -- I'm not sure where you are

16    going.  Admissible are you talking in terms of hearsay?  When

17    you say admissible, you just said admissible or inadmissible.

18    What are you talking about?

19         MR. CARPENTER:  Your Honor, if I could jump in?

20         THE COURT:  Sure.

21         MR. CARPENTER:  Andy Carpenter for Mr. Dunn.  Our

22    position is they don't have any inadmissible evidence.  It's

23    all hearsay.  I think I understood correctly when counsel said

24    that they had invited an agent or an employee to come and tell

25    what Mr. Corredor said many years ago, which is textbook

1  hearsay.  I hate to be old hat and use the word rank, but that

2  is pretty rank hearsay as they say.  They want to put in the

3  transcripts from the criminal trial which setting aside the

4  fact that they don't deal with the issue of whether these

5  three properties were used in part of the drug conspiracy.  It

6  is all completely hearsay.

7           THE COURT:  And if you can use the mic and go to he

8  podium.

9           MR. CARPENTER:  I'm sorry.

10          THE COURT:  So basically you're saying we don't want

11 a hearing because any evidence that they have is inadmissible

12 evidence?

13          MR. CARPENTER:  We are ready for a hearing.  We got

14 last night at 6:00 their position that they get to put in

15 inadmissible evidence.

16          THE COURT:  What you believe to be inadmissible?

17          MR. CARPENTER:  Yes.  They sent us a brief that say

18 we get to put in hearsay.  We filed a brief that said all your

19 putting in is hearsay.  They refiled a brief in response that

20 said, you bet it is, and we get to do it.  There is nothing in

21 their brief that said it isn't hearsay.  They argued that

22 under Rule 41 we get to put in hearsay all day as much hearsay

23 as we want to and there's nothing you can do about it.  We

24 disagree.  We were ready for a hearing.  We've got

25 cross-examination outlines.  We are going to call witnesses.

1   They are not going to call any competent witnesses.  They're

2   going to call a woman who is going to talk about a

3   conversation she overheard years ago by a drug dealer,

4   admitted murderer, not reliable, can't get under the residual

5   exception, who is flipping state's evidence in return for

6   getting off the hook of the death penalty.  So it is not going

7   to get in under residual reliability.  We can't cross-examine

8   Mr. Corredor, the architect of this drug conspiracy.  It would

9   be incredible prejudice by that.  That is -- there is no

10  hearsay exception that allows them to do that.  And that is

11  the linchpin of their case.  That is disturbing.

12          THE COURT:  Okay.  Mr. Bohling, I want you to

13  respond, but what I can do as a practical is to just hear what

14  evidence they want to put on and then make a determination

15  whether I'll consider it in the ultimate ruling.

16          MR. BOHLING:  I don't recall making any of those

17  arguments last night actually.  But in any case, I can assure

18  you that --

19          MR. CARPENTER:  -- I can show you his brief.

20          THE COURT:  The beauty of attorneys.

21          MR. BOHLING:  As I told the Court today while I

22  researched the issue on Rule 41, while I believed that it

23  would be the same as a motion hearing, suppression hearing,

24  there's very little law on that.  So I'm not trying to

25  overstate the case.  I will tell you that I think we have --

1    there is one instance --

2            THE COURT:  So you believe you have non-hearsay.

3            MR. BOHLING:  Yeah, sure.

4            THE COURT:  And you agree that the rules of evidence

5    apply?

6            MR. BOHLING:  I -- yes.  Yes.  In large part, yes.

7    There is one small piece that I will offer the Court that

8    resembles what he is talking about.  The Court can take it for

9    what it is worth I think.

10           THE COURT:  What are you presenting evidence wise?

11           MR. BOHLING:  I'm presenting Mark King, the case

12   agent, who was personally present at the time of the search

13   warrant on Mr. Dunn's house and can testify as to that.  And

14   also --

15           MR. CARPENTER:  That's not true.  Mr. Dunn --

16           THE COURT:  Hold on.

17           MR. CARPENTER:  I understand, Your Honor.

18           THE COURT:  You can't tell me what they put on.

19   Now, you might have an objection with respect to what they are

20   suggesting but you can't say it's not true because anybody can

21   take the stand.

22           MR. CARPENTER:  Well, we're voir dire him, that's

23   fine.

24           THE COURT:  Well, you can voir dire or whatever,

25   cross-examination.  But they have a right to put him on and

1    then I have a right to make a determination if it's

2    evidentiary value and the Court will consider it or not

3    consider it.

4            Hold on.  Mr. Bohling.

5            MR. BOHLING:  Thank you.  I call Mark King.

6            THE COURT:  Okay.  We're going to move forward.

7            MR. CARPENTER:  Understood.

8            THE COURT:  Mr. King, I'm going to have you stop

9    there and raise your right hand to be sworn.

10                          MARK KING

11           Called as a witness on behalf of the GOVERNMENT, was

12   duly sworn, and testified as follows:

13           THE COURT:  Thank you, sir.  You can have a seat.

14   Counsel.  And if you can just make sure that you speak in the

15   microphone.

16                      DIRECT EXAMINATION

17   BY MR. BOHLING:

18    Q    Good morning.

19    A    Good morning.

20    Q    Please state your full name and spell your last name?

21    A    Mark, middle initial R, last name, King, K-I-N-G.

22    Q    How are you employed?

23    A    I'm a Special Agent with Immigration and Customs

24   Enforcement with Homeland Security Investigations.

25    Q    How long have you had that job?

```
 1   A     29 years.

 2   Q     What are your duties as a Special Agent?

 3   A     Investigate people and goods entering the United States.

 4   Q     Have you worked any cases involving the importation of

 5   narcotics?

 6   A     Yes, many cases.

 7   Q     And what is a case agent?

 8   A     A case agent would be in control of the case.  We would

 9   be making the decisions as far as how to go about conducting

10   the investigation, what techniques to use, making the reports,

11   making sure everything was organized and presented for

12   prosecution.

13   Q     Are you familiar with a case that culminated in an

14   indictment that involved as its central figure an individual

15   named Alejandra Corredor?

16   A     Yes, sir.

17   Q     And were you involved in that case?

18   A     Yes, I was a case agent along with Scott Francis.

19   Q     Okay.  And what were your general duties in regard to

20   that investigation?

21   A     Anything you could think of.  Surveillance, interviews,

22   we did Title III wiretap investigations, reports, tracker

23   affidavits for tracker warrants, and then actually presenting

24   the case for prosecution, and there were two trials that I

25   testified in, two different trials regarding that case.
```

1    Q    Are you personally familiar with the events that

2    occurred during that investigation?

3    A    Yes, sir, I am.

4    Q    And with regard to the wiretap, can you describe for the

5    Court what wiretaps were done in general during that case?

6    A    There were two wiretaps on Alejandra Corredor's brother

7    in law, Terrance Harris.  And then I believe there were two

8    separate wiretaps on Mr. Corredor himself.  And then one of

9    his right hand man, Arturo Gonzales, that was done out of the

10   District of Kansas.

11   Q    Can you give the Court kind of a big picture overview of

12   what the Corredor conspiracy involved?

13   A    Corredor was basically -- he spoke Spanish, and he the

14   conduit, the majority of narcotics were coming out of Mexico

15   entering the United States.  Mr. Corredor spoke fluent

16   Spanish.  He was making arrangements to receive multi-kilogram

17   shipments of cocaine.  And then he would distribute that

18   cocaine to his associates who would distribute the cocaine on

19   the streets.

20   Q    And who were his major associates during the course of

21   the investigation?

22   A    There was --

23        MR. CARPENTER:  -- objection, Your Honor, they need

24   to lay a foundation that he has first hand knowledge to this

25   and that he is just not conducing hearsay from other sources.

1          MR. BOHLING:  I thought I had, Judge.

2          THE COURT:  Objection overruled.  I think they have.

3    He's the case agent and he talked about that.  So objection

4    overruled.  He can answer.

5    BY THE WITNESS:

6    A    There was -- he actually financed a rap group Block Life

7    Entertainment and there was Dandari Jones, Dennis Westbrook,

8    Adrian Dunn, Danny Moore, Arturo Gonzales.  I'm sure there are

9    others that escape my memory at this point in time.

10   Q    And do you have personal knowledge of what Mr. Dunn's

11   role was during the conspiracy?

12   A    Yes, sir.

13   Q    And what is the basis of that knowledge?

14   A    Well, when I started the investigation I spoke to

15   informants that were given me information about the core

16   group.

17         MR. CARPENTER:  Objection, Your Honor, that is

18   hearsay.

19         MR. BOHLING:  He hasn't said anything substantive

20   yet, Judge.

21         THE COURT:  It calls for hearsay maybe.  But well,

22   we're not there yet.  You can make your objection.  I'll

23   overrule the timeliness on that maybe.  Go ahead.

24   BY MR. BOHLING:

25   Q    Go ahead and complete your answer.  And I'm just asking

1   you about your basis for knowledge for Mr. Dunn?

2    A   We had intercepted phone calls between Mr. Corredor and

3   Mr. Dunn, and there were subsequent interviews with

4   Mr. Corredor following his arrest that outlined --

5         MR. CARPENTER:  -- it's hearsay Your Honor, what Mr.

6   Corredor said.

7         MR. BOHLING:  I haven't asked him what Mr. Corredor

8   said.

9         MR. CARPENTER:  He's telling it.

10        THE WITNESS:  Mr. Corredor testified that --

11   BY MR. BOHLING:

12    Q   -- right.  I'm just asking about your basis of knowledge

13   at this point.  So I understand.  Now, as far as, as far as

14   the intercepted conversations, did you listen to those

15   personally?

16    A   Yes, sir, I did.

17    Q   And were you involved with what we call the wire room?

18    A   Yes, sir, I was.

19    Q   What was your role there?

20    A   We have monitors that are contract monitors that come in

21   and actually as the calls come in live, they listen to the

22   calls and get synopsis and transcribe the calls, and we

23   oversee their activities.  And as the information comes in we

24   make a decision if surveillance needs to be done or some kind

25   of action needs to be taken.

1    Q    So you would listen to those conversations pretty much

2    in realtime?

3    A    Yes, sir.

4    Q    And then making decisions about the investigation based

5    on those calls?

6    A    Yes, sir, that's correct.

7    Q    Were you personally present at any point during the

8    search warrant at Mr. Dunn's home?

9    A    Yes, I was.

10    Q    And what day was that?

11    A    That was June 12th, 2009.

12    Q    Okay.  And just in general when did this conspiracy

13    begin?  When was -- what was the defining starting point of

14    the conspiracy for purposes of court, if you remember?

15    A    I don't remember what we put for the starting date.  The

16    investigation started in 2008, but I don't remember what we

17    put for the starting date.  But we began in earnest in the

18    spring of 2008.

19    Q    Okay.  And based on the conversations you listened to,

20    what was Mr. Dunn's role in the conspiracy?

21          MR. CARPENTER:  Objection, that is hearsay, Your

22    Honor.  He is relating the substance of conversation --

23          THE COURT:  -- what was the question again?

24          MR. BOHLING:  Based on the intercepted

25    conversations.

1          MR. CARPENTER:  That's hearsay.

2          MR. BOHLING:  I don't believe -- it would involve

3   Mr. Dunn, I don't believe it's hearsay at all.

4          THE COURT:  Well, you need to just rephrase the

5   question.  I'll sustain.

6          MR. BOHLING:  Okay.

7   BY MR. BOHLING:

8    Q    Based on your role as case agent in the investigation,

9   what was Mr. Dunn's role in the conspiracy?

10          MR. CARPENTER:  Objection.  He got that information

11   from his role as a case agent by hearing hearsay.  He was not

12   present during those conversations.  He overheard them.  And

13   he is relaying the conversation between two people not in

14   court that I can't cross-examine.  Objection.

15          THE COURT:  Okay.  I'm going to overrule the

16   objection.  I want to hear how he answers that question.

17          THE WITNESS:  Mr. Corredor supplied Mr. Dunn with

18   cocaine for distribution.

19   BY MR. BOHLING:

20    Q    Okay.  Now, let's turn our attention back to June 12th,

21   of 2009.  That was the date of what we call the takedown in

22   the case?

23    A    Actually the takedown occurred on June 11th, the day

24   before.  And I didn't get a search warrant for the house.  The

25   house was secured and we didn't actually execute the warrant

1  until June the 12th, the following day.

2  Q     And do you remember the address of that house?

3  A     I believe it was 8717 Kentucky Avenue, Kansas City,

4  Missouri.

5  Q     Okay.  Now, in the days before, the several days before

6  June 11th and June 12th, were there intercepted conversations

7  between Mr. Dunn and Mr. Corredor?

8  A     Yes, there were.

9  Q     Okay.  And what was the nature of those conversations?

10          MR. CARPENTER:  Objection, Your Honor, that's

11  classic hearsay.

12          MR. BOHLING:  It's not hearsay.  It involves a party

13  opponent, Mr. Dunn.

14          MR. CARPENTER:  It absolutely is.  Because

15  Mr. Corredor's statements are not a party opponent, and they

16  are using Mr. Corredor's statements as well.

17          THE COURT:  What was the question again?

18          MR. BOHLING:  Would the nature of the conversation

19  between Mr. Corredor and Mr. Dunn in the days before the

20  search warrant in Mr. Dunn's house.

21          I'm not offering Mr. Corredor's statements for the

22  truth of the matter asserted.  I'm just offering them for the

23  sequence of events that lead to the search warrant.

24          THE COURT:  Subsequent conduct?

25          MR. BOHLING:  Yes.  The sequence of events.  And Mr.

1    Dunn's statements are certainly admissible in Court against

2    him.  He's a party appointed.

3            MR. CARPENTER:  There not giving Mr. Dunn's

4    statements.  They are giving this agents eight years later

5    thirdhand recollection of conversations between two other

6    people.  Which is both incompetent and hearsay.

7            THE COURT:  I don't know if it is incompetent.

8            MR. BOHLING:  Mr. King remembers.

9            THE COURT:  Is the basis of your question -- it is

10   not hearsay, if it's not hearsay, what are you trying to show?

11           MR. BOHLING:  Well, it is certainly not hearsay as

12   to Mr. Dunn's side of the conversation because Mr. Dunn is in

13   Court, he is a partied opponent.

14           THE COURT:  Right.

15           MR. BOHLING:  As to Mr. Corredor's side, I think it

16   is simply to contextualize Mr. Dunn's statement which is what

17   is important here in Court.  And to show also the course of

18   events that leads to ultimately to the seizure of the $41,000

19   dollars.

20           MR. CARPENTER:  And can I just respond to that by

21   saying without Mr. Corredor's completely inadmissible hearsay

22   aside, it makes no sense and it is useless.

23           THE COURT:  Well, I don't know if it makes no sense.

24   Because sometimes you miss evidence to suggest that, Judge, it

25   is not for the truth of the matter asserted.  I'm going to

1  show the subsequent conduct of why the police officers did

2  what they did.  And that, that would be sustained.  You would

3  be overrule and I'd allow -- don't.

4          MR. CARPENTER:  -- that's true.

5          THE COURT:  I know it's true.  And if it's not

6  someone else higher than you would have to tell me it is not

7  true, i.e. the Eighth Circuit, would have to go at that point

8  to show why they did what they did.  Not the truth of the

9  matter asserted.  So these declaratory statements that are so

10  -- no.  There is nothing definite and that certainly isn't

11  definite.  So if you're talking about Mr. Dunn or if the

12  question goes to subsequent conduct of why they did what they

13  did, I'm going to overrule the objection.  If you are using it

14  just to get what this other defendant said, Mr. Corredor said,

15  it's hearsay.

16          MR. BOHLING:  It's not necessarily hearsay if it's

17  not going to the truth of the matter asserted.  It's going to

18  contextualize Mr. Dunn's statements.  Mr. Dunn's statement are

19  -- you can't untangle the two, but there is no question that

20  Mr. Dunn's statements are admissible.

21          MR. CARPENTER:  But you can't use it to

22  contextualize my client's statement unless what Mr. Corredor

23  said is true.  So you are saying that you are offering it for

24  the truth.

25          MR. BOHLING:  It's also conspiratorial

1    conversations, Your Honor, because this is during the course

2    of a drug conspiracy of which Mr. Dunn and Mr. Corredor have

3    been convicted.

4              THE COURT:  Hold on.  I don't know what Special

5    Agent King is going to say.  To the extent you're talking

6    about Dunn, he can comment on.  I don't know the intertwined

7    nature, the intertwined nature of the testimony of what you're

8    trying -- I just don't know.  I want to hear what Special

9    Agent King has to say.  And see -- I don't know the purpose of

10   it.  Rephrase the question let's cover this again.

11             MR. BOHLING:  Yes, Your Honor.

12   BY MR. BOHLING:

13    Q    Did you intercept conversations between Mr. Dunn and

14   Mr. Corredor in the days before June 12th?

15    A    Yes.

16    Q    And was there a series of conversations?

17    A    Yes.

18    Q    What did Mr. Dunn communicate during those

19   conversations, if you recall?

20             MR. CARPENTER:  Objection.

21             THE COURT:  Overruled.

22   BY THE WITNESS:

23    A    That he had $41,000 dollars to pay to Mr. Corredor.

24    Q    Okay.

25    A    That was on June 9th.

1    Q    Okay.

2         MR. BOHLING:  And Your Honor, may I approach the

3    witness?

4         THE COURT:  Yes.

5         MR. BOHLING:  I provided the witness with our

6    exhibits which everyone has a binder at this point.

7    BY MR. BOHLING:

8    Q    If you could go to Exhibit 5, Special Agent King.  And

9    what is Exhibit 5?

10   A    Yes, sir.  I'm there.

11   Q    What is that exhibit?

12   A    That is a transcript of a telephone call on June 9th,

13   2009, between Mr. Corredor and Mr. Dunn.

14   Q    And is that the transcript of the call that you just

15   referenced?

16   A    Yes, sir, it is.

17   Q    Okay.  And is this the call that concerns the discussion

18   of the $41,000 dollars?

19   A    Yes, sir, it is.

20        MR. BOHLING:  Your Honor, I would like to introduce

21   for the purposes of this hearing Exhibit 5 and also Exhibit 4

22   which I will play for the Court, which is the underlying

23   actual recorded phone call.

24        THE COURT:  Counsel.

25        MR. CARPENTER:  We object on two basis.  First of

1   all, hearsay basis.

2         Second of all, lack of foundation because there has

3   been no indication that this agent can identify my client's

4   voice, and anyone can identify that that was my client on the

5   other end. As a matter fact he can't. So foundation, hearsay

6   objection.

7         MR. BOHLING: Can I -- if I may ask another

8   question?

9   BY MR. BOHLING:

10   Q   Can you identify Mr. Dunn's voice?

11   A   No, sir, I cannot.

12         MR. CARPENTER: Same objection.

13   BY MR. BOHLING:

14   Q   All right. That's fine.

15         On this call do you have any other indications from

16   your investigation of who the speakers are?

17         MR. CARPENTER: Objection, that would be hearsay.

18         THE COURT: Overruled. I'm going to allow him to

19   answer.

20   BY THE WITNESS:

21   A   Yes, sir, we determined through the investigation

22   through intercepted phone calls that this was Adrian Dunn.

23   Q   Okay. And how did you determine that?

24   A   Through the conversations between them when they

25   referred to him as A.D. which is Mr. Dunn's initials.

1    Q    Okay.  And were there numerous recorded conversations

2   between the two of them?

3    A    Yes, sir.

4    Q    And contextually was there discussion about his home

5   during these conversations?

6    A    About his home?

7    Q    Yeah.

8    A    There were discussions about the Kentucky address, 8717.

9              MR. CARPENTER:  Objection.

10              MR. BOHLING:  It's going to the foundation of how he

11   knows it is Mr. Dunn, Your Honor.

12              MR. CARPENTER:  You can't use hearsay to lay a

13   foundation.  That's inadmissible.

14              MR. BOHLING:  The question is the reliability.  I

15   think every indication in his investigation this is Mr. Dunn

16   increases the reliability the finding that it is Mr. Dunn

17   talking.

18              MR. CARPENTER:  But you can't use hearsay to lay a

19   foundation for more evidence.

20              THE COURT:  Here's what we're going to do with

21   respect to this.  The Court is going to hear this.  The Court

22   has noted and you know, the objection is going to be a

23   standing and ongoing objection as it relates to any

24   conversation that Mr. Dunn had with this other individual Mr.

25   Corredor related to the $41,000, related to the house.  The

1    Court understands, but you can make your objection.

2              MR. CARPENTER:  Just for appeal, Your Honor.

3              THE COURT:  Yes.  You can make your objection if you

4    think a question doesn't necessarily cover what I suggested.

5              Now, it's the Court's intent to hear this evidence

6    and then make a determination whether I will consider it in

7    the Court's ultimate decision.  I understand the argument is

8    hearsay.  And if I don't consider it and then obviously I'll

9    say so.  But I do want to hear everything now.

10             Proper objections, I think you continue to make your

11   objections if you think this -- if the question and answer

12   goes outside of what I just suggested.  Make your objection,

13   preserve it.  And I am noting the testimony which is

14   questionable or arguably admissible or not admissible.

15             MR. CARPENTER:  We will have a standing objection.

16   If there's something different I will object to that.

17             THE COURT:  Thank you.

18             MR. BOHLING:  Thank you, Your Honor.  I appreciate

19   that.

20   BY MR. BOHLING:

21    Q    So Agent King, I would like to play for you and the

22   Court, Exhibit 4, which is the actual conversation as to which

23   this transcript relates.

24             THE COURT:  And I'm going to admit Exhibit 4 and 5

25   for purposes of the hearing, understanding that it is under

1    objection of the plaintiff.

2          MR. CARPENTER:  Your Honor, we also have a

3    foundational objection to the audiotape as well.

4          THE COURT:  Yes.

5          MR. CARPENTER:  There's been no chain of custody,

6    there has been no showing this agent was present and actually

7    in the van when this was overheard which is a requirement,

8    there has been no showing that he can authenticate that audio

9    file.  So we have a separate foundational objection to that.

10   They need to lay all that foundation which they cannot do.

11         THE COURT:  That's will be noted for the record.

12   You can play the video.

13         (THEREUPON; Government's Exhibit No. 4 and 5 was

14   admitted into evidence and were published to the Court.)

15         MR. BOHLING:  I think that is it.

16         MR. CARPENTER:  Your Honor, I would lodge one more

17   objection?

18         THE COURT:  Sure.

19         MR. CARPENTER:  That was unintelligible.  I couldn't

20   understand what was being said.  I object to the transcript

21   that someone else out of court, we have no idea who it was,

22   has transcribed it as.  I can't claim that is accurate,

23   neither can this agent, neither can anyone here, that was

24   unintelligible.  And the translation, there is not foundation

25   to that.  So we object to the transcript.  And we object to

1   the admission of the audio file --

2           THE COURT:  I understand that.  I'm not

3   understanding the unintelligible necessarily.  But you've made

4   your objection.  I'll follow the law.

5           MR. CARPENTER:  I was having real trouble.

6           THE COURT:  And you can question him on

7   cross-examination if you choose.

8           MR. BOHLING:  I will note for the record that these

9   were all provided within the last -- several weeks ago, I

10  think, on their request.  So they have certainly have had the

11  opportunity to both listen to them and check the accuracy of

12  the transcript.

13          MR. CARPENTER:  It got no more intelligible in the

14  time that I have had it, Your Honor.

15          THE COURT:  Well, I haven't had it and it was

16  intelligible to me.

17          MR. CARPENTER:  Probably better ears than I do.

18          THE COURT:  I don't know about that.  Maybe I just

19  understand it better than you.  Maybe that.

20          Objection noted.

21  BY MR. BOHLING:

22  Q    Now, Exhibit 4, that's is something that you have heard

23  before, correct?

24  A    Yes, sir.

25  Q    Okay.  In what context did you hear that?

1  A    It as -- as part of the investigation.  We have gone

2  through all of these calls.  We sat down with Mr. Corredor and

3  reviewed these calls.

4  Q    Okay.  I'd like to turn your attention then to June

5  12th.  And that was the day of the search warrant at the

6  Kentucky Street address?

7  A    That's correct.

8  Q    Okay.  And you indicated at some point you arrived on

9  scene?

10  A    Yes, sir.  I actually delivered the search warrant to

11  the location.

12  Q    Okay.  And were you personally present or did you

13  witness the seizure of the $41,000 dollars?

14  A    Yes, sir.

15  Q    Okay.

16        MR. CARPENTER:  Your Honor, we have an objection to

17  this line of testimony.  That he doesn't have the foundation

18  for personally observing the --

19        Would you prefer that we voir dire him before or

20  would you like to hear it now and we can bring it up at cross?

21        THE COURT:  I think you will have the opportunity to

22  cross-examine.

23        MR. CARPENTER:  Okay.

24        MR. DWERLKOTTE:  Your Honor, can I ask one question.

25  Mr. Dunn is trying to communicate with us.  Is it okay if he

1  could be uncuffed by the Marshals so that his hands could

2  move?  Rather than me getting up and down, and he is wanting

3  to communication with us, and we haven't been able to speak a

4  whole lot.  I don't know if that is possible if he is not

5  cuffed?

6          THE COURT:  Let me check with the Marshal.  Is there

7  any reason not to.

8          THE MARSHAL:  Your Honor, it has always been our

9  policy to have the defendant restrained.

10         THE COURT:  Well, what are you trying to

11 communicate?  Is he writing?

12         MR. DWERLKOTTE:  Well, I think he is trying to.  I

13 just didn't want to keep having to run over there.

14         THE COURT:  Well, just move your chair over there

15 and sit by him.  I can still see him and you can still talk to

16 him.  That's how we'll do it.  That way we are all happy.

17         Counsel, you can continue.

18 BY MR. BOHLING:

19 Q   Yes.  Turning your attention to -- well, let me ask this

20 first.  Do you know where the $41,000 dollars was located?

21 A   There was a Chevrolet Caprice parked in the garage,

22 enclosed garage, and it was in the trunk in a yellow plastic

23 bag next to a speaker in the trunk.

24 Q   And did you personally see the Caprice in the garage?

25 A   Yes, sir, I did.

1    Q    Okay.  And turning your attention to Exhibit 6, is that

2    a photograph?

3    A    Yes, sir.

4    Q    Do you recognize that photograph?

5    A    Yes, sir.  That is the Caprice in the garage at 8717

6    Kentucky.

7    Q    And is this on June 12th, the day of the search warrant?

8    A    Yes, sir.

9    Q    Is that a fair and accurate representation of how the

10   Caprice appeared on that day?

11   A    Yes, sir.

12        MR. BOHLING:  Your Honor, I move for the admission

13   of Exhibit 6 into evidence for purposes of the hearing.

14        MR. CARPENTER:  No objection.

15        THE COURT:  Plaintiff's Exhibit No. 6 shall be

16   admitted.

17        MR. BOHLING:  Thank you.  I think we marked them as

18   government.  I think we are the defendant, Your Honor.

19        THE COURT:  I'm sorry.

20        MR. BOHLING:  That's all right.  We are usually the

21   plaintiff.

22        THE COURT:  Government's Exhibit No. 6 shall be

23   admitted.

24        (THEREUPON; Government's Exhibit No. 6 was then

25   admitted into evidence by the Court.)

1  BY MR. BOHLING:

2  Q    If you look at Exhibit No. 7.

3  A    Yes, sir.

4  Q    Is that also a photograph?

5  A    That is the same vehicle, the Caprice.

6  Q    Okay.  And just for the record, to your knowledge, is

7  this Caprice the same Caprice that is the subject of our

8  hearing today in terms of having been a forfeited asset?

9  A    Yes, sir, it is.

10  Q    And is that a fair and accurate representation of the

11  Caprice and its license plate as it appeared on that date?

12  A    Yes, it is.

13         MR. BOHLING:  Your Honor, I move for the admission

14  of Government's Exhibit 7 into evidence.

15         MR. CARPENTER:  No objection.

16         THE COURT:  Government's Exhibit 7 shall be

17  admitted.

18         (THEREUPON; Government's Exhibit No. 7 was then

19  admitted into evidence by the Court.)

20  BY MR. BOHLING:

21  Q    And turning to Exhibit 8.  Do you recognize that

22  photograph?

23  A    Yes, sir, I do.

24  Q    And what does it depict?

25  A    That was a bag containing $41,000 dollars in US currency

1  that was recovered from the back of the Caprice we just looked

2  at in the pictures.

3  Q    Okay.  Is that a fair and accurate depiction of how the

4  bag and the car appeared on that day?

5  A    Yes, sir.

6         MR. BOHLING:  Your Honor, I move for Government's

7  Exhibit No. 8 into evidence.

8         MR. CARPENTER:  We object to that.  There has been

9  no foundation laid that the agent actually took part in the

10  search of the trunk or was anywhere approximate enough to

11  identify that view is accurate.

12         MR. BOHLING:  I don't think it is required that he

13  be involved in the search per se.  He just has to be there and

14  be able to recognize the scene.

15         THE COURT:  Government's Exhibit No. 8 shall be

16  admitted over objection.

17         (THEREUPON; Government's Exhibit No. 8 was then

18  admitted into evidence by the Court.)

19  BY MR. BOHLING:

20  Q    Turning to Government's Exhibit No. 9.  Do you recognize

21  that exhibit?

22  A    Yes, sir.  It is the same bag of money in the trunk of

23  the Caprice.

24  Q    And that is just more of a close up view than we had in

25  No. 8?

1    A    I'm sorry?

2    Q    That's more of a close up view?

3    A    Yes.

4    Q    And is that a fair and accurate depiction of how the

5    money appeared on that day?

6    A    Yes.

7              MR. CARPENTER:  Same objection.

8              THE COURT:  Objection will be admitted -- I mean,

9    Government's Exhibit 9 shall be admitted over objection.

10              (THEREUPON; Government's Exhibit No. 9 was then

11    admitted into evidence by the Court.)

12    BY MR. BOHLING:

13    Q    Looking at Government's Exhibit No. 10, do you recognize

14    that scene?

15    A    It is the same bag of money from Exhibit 9 and 10, just

16    removed from the trunk and set on top of the speaker in the

17    trunk of the Caprice.

18    Q    So is -- the purpose of this photograph is to show the

19    speaker essentially?

20    A    I'm sorry?

21    Q    Was the purpose of this photograph to show the speaker

22    in the trunk?

23    A    No, it was to show the bag of money removed from the

24    place where it was concealed so you could see the entire bag.

25    Q    Is that a fair and accurate depiction of how the bag of

1  money appeared on that day?

2   A    Yes, sir.

3           MR. BOHLING:  Your Honor, I'd move Exhibit No. 10

4  into evidence.

5           MR. CARPENTER:  Same objection.

6           THE COURT:  Government's Exhibit No. 10 shall be

7  admitted over objection.

8           (THEREUPON; Government's Exhibit No. 10 was then

9  admitted into evidence by the Court.)

10  BY MR. BOHLING:

11   Q    Government's Exhibit No. 11, do you recognize the scene

12  depicted in that photograph?

13   A    Yes, sir.  It is the same bag of money from Exhibits 8,

14  9, and 10.  Just a different view with an agent holding it up.

15   Q    In this view what can you then see that is different

16  than the other photographs.

17   A    You can actually see that it is US currency.

18           MR. BOHLING:  Your Honor, I move Exhibit No. 11 into

19  evidence?

20           MR. CARPENTER:  Same objection.

21           THE COURT:  Government's Exhibit No. 11 shall be

22  admitted over objection.

23           (THEREUPON; Government's Exhibit No. 11 was then

24  admitted into evidence by the Court.)

25  BY MR. BOHLING:

1   Q    Okay.  And then Government's Exhibit No. 12, do you

2   recognize that exhibit?

3   A    Yes, sir.

4   Q    And what is depicted there?

5   A    It is the Chevrolet Caprice in the garage at 8717

6   Kentucky.

7   Q    And that is on the day of the search warrant?

8   A    Yes, sir.

9   Q    Is that a fair and accurate depiction of the Caprice as

10  it appeared that day?

11  A    Yes, sir.

12       MR. BOHLING:  Your Honor, I move Exhibit 12 into

13  evidence.

14       MR. CARPENTER:  Same objection.

15       THE COURT:  Government's Exhibit No. 12 shall be

16  admitted over objection.

17       (THEREUPON; Government's Exhibit No. 12 was then

18  admitted into evidence by the Court.)

19  BY MR. BOHLING:

20  Q    Agent King, once the $41,000 dollars was located what

21  happened to it?

22  A    It was taken to a bank and converted to a cashier's

23  check and turned over to Customs and Border Protection for the

24  initiation of forfeiture.

25  Q    And if you know, is this the same $41,000 dollars that

1   is one of the assets involved in the action before the Court

2   today?

3          MR. CARPENTER:  Objection, Your Honor, he keeps

4   saying $41,000.  I don't think there is any foundation that

5   the agent actually counted the money that was taken out of the

6   trunk.  And to the extent that someone told him it was

7   $41,000, that is hearsay again.

8          THE COURT:  Overruled.

9   BY THE WITNESS:

10   A    It is the same $41,000 dollars that this action is

11   regarding today.

12   Q    Okay.  And Agent King, just to shore up the record, you

13   were personally involved in communicating with the FP&S

14   officer during the course of the administrative proceeding,

15   right?

16   A    Yes, sir.

17   Q    Okay.  And so you had discussions with her about these

18   funds and the forfeiture action?

19   A    Yes, sir.

20   Q    Okay.  And you don't have any doubt that this money that

21   was recovered at Kentucky is the same money that was

22   ultimately administrative forfeited?

23   A    I have no doubt.

24   Q    Okay.  Thank you.

25          MR. BOHLING:  Your Honor, that's all I have for this

1  agent.  Oh, I do have if I could just two more things?

2          THE COURT:  Yes.

3          MR. BOHLING:  I think we're in agreement on this but

4  if I could approach the witness very quickly.

5          THE COURT:  That's fine.

6  BY MR. BOHLING:

7  Q    If you can look -- I've marked -- counsel, I've marked

8  this Exhibit 14 the title document as to the Caprice, and

9  Exhibit No 15, the title of the Corvette.  Do you recognize

10 those documents, Agent King?

11 A    I have not seen these documents before.

12         MR. BOHLING:  All right.  Can we just stipulate that

13 these items were sold?

14         MR. CARPENTER:  We will stipulate, yes.

15         MR. BOHLING:  All right.  Parties will stipulate

16 that these items were sold.  Do you have any objection,

17 counsel, to me providing these to the Court?

18         MR. CARPENTER:  No.

19         MR. BOHLING:  Okay.  Thank you.  Your Honor,

20 pursuant to that stipulation I'll provide to the Court what

21 I've marked as Government's Exhibit 15 and 16.  And these are

22 reflective of the sale of the Caprice and the Corvette.

23         THE COURT:  Based on the parties stipulation,

24 Exhibit Nos. 14 and 15 shall be admitted.

25         (THEREUPON; Government's Exhibit Nos. 14 and 15 were

Denise Carroll Halasey CCR, CVR-CM

```
1    then admitted into evidence by the Court.)
2            MR. BOHLING:  And we will add those to the exhibit
3    list.
4            Thank you.  With that, I believe I have completed
5    with direct.
6            THE COURT:  Thank you.  Mr. Carpenter.
7            MR. CARPENTER:  Thank you.
8                      CROSS-EXAMINATION
9    BY MR. CARPENTER:
10    Q    Good morning, Agent King, how are you?
11    A    I'm fine.  How are you?
12    Q    Good, thanks.
13    A    Good.
14    Q    My name is Andy Carpenter, we haven't had a chance to
15    meet yet, but good morning.
16    A    Good morning.
17    Q    Let us talk about the audio file that you were asked to
18    testify about which was Defendant's Exhibit 4, correct?
19    A    Yes, sir.
20    Q    How long ago was that audio file recorded?
21    A    Eight years ago.
22    Q    It has been a little bit more than eight years, right?
23    A    That's right.
24    Q    And about how many hours of recorded wiretap audiotape
25    at operation Blockbuster -- operation Blockbuster is the name
```

1    of this operation, correct?

2    A    That's right.

3    Q    About how many total hours of recorded audiotape did

4    operation Blockbuster record?

5    A    I would have no idea at this point.  It's been eight

6    years.  So hundreds of hours.

7    Q    A lot?

8    A    Yeah.

9    Q    And it is been a long time, understandably.  And you

10   said you had a private contracting group who was doing the

11   actual monitoring and recording, right?

12   A    Yes, sir, that is correct.

13   Q    They're the guys sitting in the vans that you see on TV

14   with the headphones on kind of recording it, right?

15   A    No, not exactly.

16   Q    No headphones?

17   A    Yes, they have headphones.  It's not done in a van.

18   Q    Fair enough.  Fair enough.  I've seen too many Sopranos

19   episodes apparently.

20        But safe to say that you weren't present when most

21   of those recordings were done, right?

22   A    I was around an awful lot.  It wasn't there for all the

23   calls, no.

24   Q    Where you present and can you remember eight years later

25   whether you were present that that recording that is Defense

1    Exhibit 4 was done?

2    A    No, I can't remember.

3    Q    So there's really no way for you to say that that

4    recording accurately records and memorializes what came

5    through the wire that day, is there?

6    A    Yeah, absolutely, I can.  The calls come in they are

7    recorded and the actual disk on which the calls are recorded

8    are taken to the Court and sealed at the end of the wiretap.

9    Q    It's been eight years, right?

10    A    Yes, but it hasn't changed in eight years.

11    Q    Have you been in custody -- have you been the custodian

12    of that voice file?

13    A    Am I the custodian?

14    Q    Right.

15    A    No.

16    Q    So you don't know where it has been the last eight

17    years?

18    A    It has been in evidence.

19    Q    So there is no way -- who has been the custodian?  Who

20    has been in charge of it over the last eight years?

21    A    I believe that would be our technical enforcement

22    officer, Cliff Howard.

23    Q    So it has not been in your custody over the last eight

24    years, correct?

25    A    Not mine personally.

1    Q    Right.  And you're not the custodian of it so you can't

2    testify as to where it's been and how it's been stored,

3    correct?  Correct?

4    A    Well, let me -- I'm thinking about it.

5    Q    Sure.  You're thinking.  I appreciate it.

6    A    I can testify I know where it has been stored.  I'm not

7    the custodian of it.

8    Q    Right.  But you don't have any personal knowledge that

9    this particular file was here, not moved, not taken by anyone

10   over that eight year gap, right?

11   A    No, I can't say that.

12   Q    Right.  And like we have established, you didn't have

13   the opportunity to hear the contemporaneous conversation when

14   it came in, right?

15   A    I could have been there.

16   Q    But you don't know.  In fairness, right?

17   A    Yes.

18   Q    So you have no independent recollection where you can

19   say that this is an accurate tape?  In other words you have to

20   rely on the general processes, right?

21   A    Yes.

22   Q    Fair enough.  Fair enough.

23        Let's talk about operation Blockbuster.

24   A    Okay.

25   Q    Huge operation, right?

Case 4:16-cv-00493-BGWS-Document 50   Filed 08/28/17   Page 71 of 176

1    A    Yes, sir.

2    Q    It went on in some form for years, right?

3    A    Yes, sir.

4    Q    Who is Alejandra Corredor, a little background?

5    A    Alejandra Corredor, he first came to my attention in

6    2004.  We were doing wiretap investigation and he was

7    intercepted.  And after all of the arrest in that case were

8    made, there was an effort to identify who he was, and over

9    time we identified him as Alejandra Corredor.

10   Q    That was about 2006 that you figured out what his real

11   identify was, right?

12   A    Yes, that's right.

13   Q    So you have been looking to get this gentleman for

14   years, correct?

15   A    No exactly.  I have a lot of different investigations.

16   He was on the radar, he was off the radar, he came back in.

17   We conducted an investigation and we had operation

18   Blockbuster.

19   Q    Sure.  And it really began in earnest what in 2008, is

20   that accurate?

21   A    That's accurate.

22   Q    Okay.  So it went on as an active operation for several

23   months?

24   A    I would say a year more or less.

25   Q    Fair enough.

1            And the focus of operation Blockbuster wasn't just

2    Alejandra Corredor, but you also wanted to indict and convict

3    all members of his drug trafficking conspiracy, right?

4    A    Fair enough.

5    Q    You were casting a broad net, right.

6    A    Well, the goal in the investigation is always to go one

7    step higher than the person you are looking at.

8    Q    Absolutely.  And at the time you were working for

9    Homeland Security was your agency, correct?

10   A    Yes, sir.

11   Q    There were multiple agencies involved by the time it was

12   done, correct?

13   A    Yes, sir.

14   Q    KCPD locally, right?  And the DEA as well?

15   A    Yes.

16   Q    Basically you guys did a lot of investigative work

17   during the course of this undercover operation?

18   A    Yes, sir.

19   Q    You guys did wiretaps, right?

20   A    Yes, sir.

21   Q    Why do you do wiretaps, briefly, what are you trying to

22   catch?

23   A    It's an investigative tool of last resort.  After you

24   have used every other investigative method, surveillance,

25   witnesses, trackers, search warrants, whatever, it helps -- it

1    actually helps you do a better job of defining the whole

2    organization, developing probably cause to charge and convict

3    these people.

4    Q    And in a nutshell you are trying to catch people

5    recorded on tape talking about drug activity, correct?

6    A    You are trying to dismantle a criminal organization.

7    Q    And how many wiretaps did you do in this case, and by

8    this case, I mean operation Blockbuster?

9    A    Well, there were extensions.  I want to say maybe six or

10   seven?

11   Q    Six or seven different individuals.  Do you remember who

12   the individuals were?

13   A    Yes, sir.

14   Q    Were any of them Adrian Dunn?

15   A    No, sir.

16   Q    So you never tapped Adrian Dunn's phone?

17   A    No, sir.

18   Q    I think you said earlier there were hundreds of hours of

19   conversations recorded though throughout the course of this?

20   A    Yes.

21   Q    So you had a lot of audiotaped wiretap information

22   basically?

23   A    That's correct.

24   Q    And you guys did some controlled buys during the course

25   of the investigation, right?

```
1    A    You know, I don't think we did one controlled buy.

2    Q    Do you remember testifying about doing a controlled buy

3    during your testimony in the criminal trial?

4    A    Possibly.  I'd have to go back and look at the

5    transcript.

6    Q    It's been a long time, understandably.  Video

7    surveillance though.  Do you remember the video surveillance,

8    right?

9    A    Yes, sir, I do.

10   Q    You did a lot of video surveillance during this

11   investigation, right?

12   A    Yes, sir.

13   Q    Why do you do video surveillance?  What is the purpose

14   of that?

15   A    You mean actually recording it?

16   Q    Right.  There are two kinds of surveillance, right?

17   There is live eyes where you've got agents watching.  And then

18   there is video where you have got tape, right?  It's not tape

19   anymore but it's a photographic file, right?

20   A    That's right.

21   Q    And you guys did some photographic video surveillance,

22   right?

23   A    Yes, sir.

24   Q    And who did you look at?

25   A    Who did I look at?
```

1    Q    Well, what location is probably a better question.  What

2    location?

3    A    Our primary focus was a house on East 92nd Place.  I

4    think 8416 East 92nd Place.  Because that was a house where a

5    lot of people would congregate.  And they would -- it was used

6    as a stash house by this organization.

7    Q    And that was owned by Mr. Corredor?

8    A    No, that was Vincent.

9    Q    Jackson?

10   A    Vincent Charles.

11   Q    That's right.  The that was a remote video, right?

12   A    Yes.

13   Q    Where you could turn it on and move it around remotely?

14   A    Yes.

15   Q    Did you do any other video surveillances during

16   operation Blockbuster that you can recall?

17   A    Took a lot of pictures, video surveillance, but I can't

18   recall any.  Maybe at Mr. Corredor's house.  But not Mr.

19   Dunn's.

20   Q    You did not do any video or photographic surveillance of

21   Mr. Dunn's address at 8717 Kentucky?

22   A    I don't believe so.

23   Q    And that was a house that he was renting to someone,

24   right?

25   A    I have no idea what his relationship to that property

1   was.

2   Q    Well, he had a separate residential address, correct?

3   A    That's my understanding.

4   Q    On Crisp Street?

5   A    That's my understanding.

6   Q    Right.  But you didn't survey the Crisp residence of Mr.

7   Dunn either, did you?

8   A    No, sir.

9   Q    And you did a lot of what you call trash pulls during

10  this investigation, right?

11  A    Yes, sir.

12  Q    And what is trash pulls?

13  A    Picking up somebody's trash that they leave curbside and

14  digging it to see if you can find anything of evidentiary

15  value.

16  Q    It's a glorious job, no doubt.

17  A    I'm sorry?

18  Q    It sounds like a glorious job.

19  A    It has it's moments.

20  Q    I'm sure it does.

21       And you did several trash pulls during the course of

22  this investigation, right?

23  A    Yes, sir.

24  Q    Do you remember which addresses you did them for?

25  A    Mr. Corredor's mother in law's house.  There was a trash

1   pull at Vincent Charles's house.  I don't even know that there

2   were several trash pulls.  Maybe a few different trash pulls.

3   Those are the only two that come to mind right now.

4   Q    But you didn't do any at Mr. Dunn's 8717 Kentucky

5   address, did you?

6   A    Didn't do one at his house.  Didn't do one at Mr.

7   Corredor's house?

8   Q    You used vehicle tracking devices, right?

9   A    Yes, sir.

10  Q    Mobile tracking devices that you put on different

11  vehicles and you can see on the computer where the vehicles

12  were going, correct?

13  A    Yes, sir.

14  Q    And which vehicles did you track during that method of

15  operation Blockbuster?

16  A    Um -- Mr. Corredor's was the primary focus.

17  Q    Okay.  Were there any other vehicles that you tracked

18  during the course of your investigation electronically?

19  A    There was another associate, I don't remember his name.

20  They called him by the nickname, Bay Bay.  I'm sure there were

21  others that aren't coming to mind right off the top of my

22  head.

23  Q    But you never did one for the '74 Chevy Caprice, that is

24  the subject of this forfeiture action, right?

25  A    No, sir.

1    Q    And you never did one for the 2005 -- and by one, I mean

2  a electronic tracking, you never did electronic tracking for

3  the 2005 Corvette either?

4  A    No, sir.

5    Q    Did you ever do one for the silver BMW registered to

6  Renee Dunn?

7  A    No, sir.

8    Q    And you never did any electronic vehicles associated

9  with Mr. Dunn, correct?

10  A    No, sir.

11    Q    And this operation Blockbuster, understandably, resulted

12  in a long trial, right?

13  A    Two trials, yes, sir.

14    Q    Yes.  And you testified for the government during the

15  criminal trial of Mr. Dunn and some of his codefendants,

16  right?

17  A    Yes, sir.

18    Q    And you were sitting at the prosecution table desk for

19  most of the trial?

20  A    Yes, sir.

21    Q    And you stayed and watched most of the trial, correct?

22  A    That's correct.

23    Q    You were present for the whole thing, right?

24  A    Yes, sir.

25    Q    Soup to nuts.  And about 12 law enforcement agents, 12

Case 4:16-cv-00493-BCW   Document 50   Filed 08/28/17   Page 79 of 176

1    different law enforcement agents testified during the course

2    of that trial, does that sound right to you?

3     A    That sounds about right.

4     Q    I'm not going to bore you by going through them.  But

5    there was a lot of law enforcement officers from different

6    agencies, right?

7     A    Yes, sir.

8     Q    It was an interagency effort, correct?

9     A    Yes, sir.

10    Q    Do you recall that none of those witnesses, none of

11    those law enforcement officers during the course of that trial

12    ever testified that Mr. Adrian Dunn used that Chevy Caprice to

13    buy or sell drugs, did they?

14    A    No, they did not.

15    Q    And none of those witnesses during the entire course of

16    the trial testified that Mr. Dunn used the Corvette to buy or

17    sell drugs, did they?

18    A    No, sir.

19    Q    And during the course of the trial none of those law

20    enforcement officers testified that Mr. Dunn used the '74

21    Chevy Caprice to transport proceeds from drug sales, did they?

22    A    No, sir.

23    Q    And during that trial none of those law enforcement

24    witnesses testified that Mr. Dunn used the Corvette to

25    transport proceeds from drug sales, did they?

1    A    No, sir.

2    Q    And none of those witnesses, and I'm talking about the

3    law enforcement witnesses testified during the course of the

4    trial that that $41,000 dollars found in the trunk of Mr.

5    Dunn's Caprice was drug proceeds, did they?

6    A    No, sire.

7    Q    You also in addition to the 12 law enforcement officers

8    had four separate witnesses who had turned state's evidence,

9    right?

10   A    Yes, sir.

11   Q    Including Mr. Alejandra Corredor, Keith Rayford,

12   Terrance Harris, and Joel Ravara, right?

13   A    Yes, sir.  I think there was one more, but I could be

14   mistaken.

15   Q    The point is there were several state witnesses that

16   turned state's witnesses and gave testimony against people

17   they testified they had previously been in drug business with,

18   correct?

19   A    Yes.

20   Q    And none of those witnesses, including Mr. Corredor ever

21   testified that Mr. Dunn used that Chevy Caprice to buy or sell

22   drugs, did they?

23   A    No, sir.

24   Q    And none of those witnesses in the over 800 pages of

25   transcript testified that Mr. Dunn ever used his Corvette to

1  buy or sell drugs, did they?

2   A    No, sire.

3   Q    And likewise, none of those state witnesses -- I should

4  probably say government's witnesses, testified that Mr. Dunn

5  ever used that Corvette to transport drug proceeds, did they?

6   A    No, sir.

7   Q    And none of those witnesses testified that Mr. Dunn used

8  the Caprice to transport drug proceeds, did they?

9   A    No, sir.

10   Q    And none of those witnesses testified that that $41,000

11  dollars in the trunk of the Caprice was from proceeds of drug

12  sales, did they?

13   A    No, sir.

14   Q    Let's talk about the Caprice a little bit.  Out of the

15  100 of hours of taped audio surveillance testimony.  How many

16  times is the Caprice mentioned?

17   A    It's not mentioned.

18   Q    It's not mentioned at all, is it?

19   A    No, sir.

20   Q    And there is no audiotape evidence of Mr. Dunn ever

21  using the Caprice to buy or sell drugs, right?

22   A    No, sir.

23   Q    There is no tape where Mr. Dunn says I'm going to hop in

24  the Caprice and go sling some cocaine?

25   A    No, sir.

Denise Carroll Halasey CCR, CVR-CM

1    Q    Out of the hundreds of hours of videotape testimony --

2   excuse me.  Strike that.  Out of all of the video surveillance

3   and photographs taken, there is no photographic evidence of

4   Mr. Dunn using the Caprice to sell or buy drugs, is there?

5    A    No, sir.

6    Q    As a matter of fact, I don't think that Mr. Dunn showed

7   up on any of the photographic evidence at all during the

8   entire course of the case in the investigation, did he?

9    A    No, sir.

10    Q    And as far as you know that Caprice was parked in the

11   garage at the 8717 West Kentucky residence, right?  The entire

12   time?

13    A    Yes, sir, it could have been.

14    Q    You never saw it move out did you?

15    A    No, he wasn't the primary focus of the investigation.

16    Q    Yeah, Mr. Dunn wasn't the primary focus, was the?

17    A    No, sir.

18    Q    And you hadn't gathered a lot of information about

19   Mr. Dunn at that point when you had to execute the warrants,

20   had you?

21    A    DEA had a separate investigation on Mr. Dunn.

22    Q    Right.  Officer Francis, you met during -- I think it is

23   James Francis, is that correct?  Does that ring a bell?

24    A    No, sir.

25    Q    Scott Francis.  I'm sorry, my colleague corrects me.

1    A    No, he's the co-case agent with me.  He works for

2    Homeland Security Investigations.  DEA had a separate

3    investigation on Mr. Dunn.

4    Q    Fair enough.  And you guys weren't really targeting

5    Mr. Dunn at all even, right?

6    A    Well, I mean we were targeting the organization.

7    Mr. Corredor was obviously the head of the local organization.

8    He was receiving drugs from Mexican drug cartels so we're

9    looking at the Mexican drug cartels, we're looking at Mr.

10   Corredor.  And then we are looking at all the people

11   Mr. Corredor was distributing the cocaine to.  So Mr. Corredor

12   and the Mexican cartel, we don't generally move down in our

13   investigations, we move up.  That's our goal.  That's our

14   objective to go as high up as we can.  So Mr. Dunn was just

15   another customer of Mr. Corredor so he wasn't a big focus of

16   the investigation.

17   Q    Fair enough.  And you actually had to end that

18   investigation prematurely, right?

19   A    Yes, sir.

20   Q    Because you had indication there was going to be some

21   violence.

22   A    That's correct.

23   Q    And it wasn't safe for the officers, it wasn't safe for

24   people on the streets so you had to execute those warrants.  I

25   think your phrase was, earlier than what you were expecting

1    to, right?

2    A    That's right.

3    Q    And at that point you had limited information on Mr.

4    Dunn, right?

5    A    It depends on what you mean by limited information.

6    Q    Let me put it this way, if you would've had an optimal

7    situation, you would have continued to developing information

8    on Mr. Dunn, correct?

9    A    He wasn't the primary focus of the investigation.

10    Q    So you didn't really care about Mr. Dunn?

11    A    No, sir, I didn't.

12    Q    Fair enough.  Let's talk about the Corvette.  Same setup

13    as with the Caprice.  Out of the hundreds of hours of all of

14    the conversations recorded by the wiretaps, is there any

15    mention of the Corvette?

16    A    No, sir.

17    Q    And so likewise there was audiotape evidence, there is

18    zero evidence of Mr. Dunn ever using that Corvette to buy or

19    sell drugs, correct?

20    A    Well, there are statements made by Mr. Corredor.

21    Q    Let's focus on -- we'll deal with that at a certain

22    point, but I want to focus on audiotape evidence that you took

23    during the course of your surveillance.  Because you guys had

24    hundreds of hours, right?

25    A    There is no audiotape evidence regarding the Corvette.

1    Q    Fair enough.  And there isn't any photographic or video

2    evidence of the Corvette being used to buy or sell drugs, is

3    there?

4    A    No, sir.

5    Q    And there no videotaped or audiotape evidence of the

6    Corvette being used to transport drug proceeds, is there?

7    A    No, sir.

8    Q    In the course of your investigation, as we talked about

9    because you ended it a little prematurely, and as you said,

10   Adrian Dunn really wasn't who you were looking at, you didn't

11   do any checks to see what vehicles Adrian Dunn owned, did you?

12   A    It's difficult to say.  I mean, part of our

13   investigations, his house -- the house at 8717 Kentucky was an

14   early focus of the investigation.  It involved -- there was

15   information from a tracker on Mr. Corredor's vehicle that led

16   us to that address.  And the DEA surfaced about Mr. Dunn.  So

17   at that point we kinda back off Mr. Dunn.  But I'm sure there

18   were vehicles that we identified at that residence that we ran

19   checks on.  But I can't tell you that.  But it is standard

20   practice as we identify residences connected to investigation,

21   we get license plates and we get the information regarding who

22   the registered voters are, and the addresses.  We keep a

23   spreadsheet of that information.  So the vehicles could be on

24   a spreadsheet, but I can't tell you at this point without

25   going back to look at that information.

1    Q    In fact, during the investigation you had Mr. Dunn,

2    quote unquote, associated with the silver BMW, right?

3    A    Yes, I believe that is correct.

4    Q    And also associated with the dark SUV, correct?

5    A    I'm not sure.

6    Q    You're not?  Okay.  But my point is, you, during the

7    investigation never associated him with either a '74 Caprice

8    or a 2005 Corvette, correct?

9    A    Not until the very end of the investigation.

10    Q    Right.  Not until the warrants were executed and you

11    found these vehicles for the first time, right?

12    A    Right.

13    Q    As a matter of fact the first time you became aware that

14    he even owned these vehicles was after the warrants were

15    executed, right?

16    A    Yes, sir.  They came up earlier on my spreadsheet like I

17    was saying before.

18    Q    Fair enough.  So you didn't do any background checks

19    before you seized the vehicles and before the June 12th,

20    warrants were executed to determine whether -- excuse me.  How

21    Mr. Dunn obtained either the Caprice or the Corvette, did you?

22    A    No, sir.

23    Q    You don't know what he paid for them, do you?

24    A    No, sir.

25    Q    You don't how he paid for them?

```
 1    A     No, sir.

 2    Q     You don't know if he paid cash?

 3    A     No idea.

 4    Q     You don't know if he got 0.1 financing?

 5    A     Could have.

 6    Q     Could have.  Don't know if he had any trade-ins?  Did

 7    you do any checks before the warrants were executed to see

 8    what legal businesses Adrian Dunn had?

 9    A     What vehicle businesses?

10    Q     No, I'm sorry.  Legal businesses?

11    A     Legal businesses?

12    Q     Right.  What he did for the living other than the

13    alleged conspiracy to distribute?

14    A     There was some work done on that.  I'm not personally

15    aware of what it was.  I have some confusion as to what he

16    actually did for a living.

17    Q     Fair enough.  But you have no basis to say that he

18    didn't work several legitimate jobs?

19    A     I do not.

20    Q     Fair enough.  You weren't aware that he ran a vehicle

21    towing business, correct, at the time you executed the

22    warrants?

23    A     I had heard something about a towing business.

24    Q     That rings a bell?  Okay.  Did you know that he ran a

25    car detailing business?
```

Denise Carroll Halasey CCR, CVR-CM

1    A    No, sir.

2    Q    Were you aware as to whether or not Mr. Dunn bought and

3    sold used vehicles to generate income?

4    A    No, sir.

5    Q    And were you aware at the time you executed the

6    June 12th, 2009, warrants whether Mr. Dunn did remodeling

7    work as well?

8    A    No, sir.

9    Q    So basically you don't know what Adrian Dunn's income

10   from non-drug trafficking resources would've been in 2009?

11   A    I do not.

12   Q    So it is impossible for you as you sit here today and

13   say that he would've purchased, he would've had to purchased

14   either one of those vehicles using drug proceeds, right?

15   A    I can't say that.

16   Q    Fair enough.  Now, let's talk about the 8717 address.

17   That's the address where the Caprice was located where

18   Exhibits 6, 7, 8, 9, and 10 were identified, correct?

19   A    That's correct.

20   Q    And there was surveillance conducted of that residence

21   prior to the execution of the search warrants on June 12th,

22   2009, correct?

23   A    Yes, sir.

24   Q    About how long was that surveillance conducted, do you

25   remember?

1    A    How long?

2    Q    Right.  Just before June 12th, 2009, did yours or one

3    of your participating agencies have eyes on that particular

4    property?

5    A    I only remember one specific instance and that was I

6    believe in May.  That one sticks out in my mind because there

7    were some phone calls made and Mr. Corredor was supposed to go

8    pick up some money at that address, and Mr. Dunn's associate

9    noticed one of our cars doing surveillance in the

10   neighborhood.  And so they changed plans and had Mr. Dunn's

11   associate Mr. Miles take money to Vincent Charles house at

12   8416 East 92nd Place.  That's the one surveillance -- we

13   didn't do a lot of surveillance at that house.

14   Q    Sure.

15        MR. CARPENTER:  I appreciate the thoughtfulness of

16   the answer, but I've got to move to strike most of that

17   answer, Your Honor.  I just asked how long they had been doing

18   the surveillance, not the subject of conversations relating to

19   that.  So I move to strike that as nonresponsive, Your Honor.

20        MR. BOHLING:  I would object to the motion to

21   strike.  I think that was a clearly responsive answer to the

22   questions posed.  He essentially asked for hearsay, and got

23   it.

24        MR. CARPENTER:  I think I asked how long they had

25   been surveying the place.

```
 1          THE COURT:  The objection is overruled.
 2    BY MR. CARPENTER:
 3    Q    So that was in May.  Warrants were executed in June.  So
 4    was there surveillance for about six weeks on the residence?
 5    A    We did limited surveillance.  I said that was the one
 6    surveillance -- I was just trying to put it in context.
 7    Q    Okay.
 8    A    That's the one surveillance I remember.
 9    Q    So it came and went?
10    A    It was short-lived because we were basically --
11    surveillance was made.
12    Q    Okay.  But while you were doing surveillance on that
13    property, you had eyes on the property 24 hours a day?
14    A    No, sir.
15    Q    No?  How long would surveillance go?
16    A    That was the only instance I remember.  And that
17    surveillance was short-lived a couple hours because
18    surveillance was made so.  And I don't think there were any
19    more attempts to do surveillance at that address after that
20    date.  Before there were drive-bys where we checked on the
21    residence.  I can't tell you how me times we drove by.
22    Q    Okay.
23    A    But there were no long protracted drawn out surveillance
24    of that residence.  I know DEA actually did a lot more work on
25    that address.  They had a lot more information on Mr. Dunn and
```

1  that address than I did or we did.

2  Q    Okay.  So was the DEA doing separate surveillance on

3  that address in addition to Homeland Security?

4  A    They had an investigation on Mr. Dunn and we bumped in

5  to other during our separate investigations.  And they

6  basically backed off because we had a wiretap.  It kind of --

7  we were intercepting Mr. Dunn.  So they backed off their

8  investigation.

9  Q    Wiretap trumps, basically?

10  A    Yes.

11  Q    Fair enough.  During the entirety of that surveillance

12  and the drive-bys either by you, your organization, or by the

13  DEA, no one ever once saw Adrian Dunn driving that '74 Caprice

14  to that address?

15  A    Not to my knowledge.

16  Q    And no one ever saw him during that entire course of

17  surveillance driving that 2005 Corvette to the address,

18  correct?

19  A    Not to my knowledge.

20  Q    And that surveillance and the drive-bys never once saw

21  Adrian Dunn selling or buying drugs in either of those

22  vehicles during the surveillance?

23  A    No, sir.

24  Q    And you never once even saw -- and by you, I mean the

25  surveillance.  The surveillance never once saw Adrian Dunn

1   even present at that 8717 Kentucky address once, correct?

2   A    I can't.  I can't answer that with 100 percent

3   certainty.

4   Q    Hold on one second.

5   A    Not on our investigation, perhaps the DEA investigation.

6   Q    And none of that information from the DEA is going to be

7   presented during the government's case in this hearing, is it?

8   A    No, sir.

9   Q    And none of that surveillance at the 8717 Kentucky

10  residence ever saw anyone driving the 2005 Corvette there, did

11  they?

12  A    No, sir.

13  Q    And none of that surveillance never saw anybody, much

14  less Mr. Dunn driving the '74 Caprice, did it?

15  A    No, sir.

16  Q    In fact, Adrian Dunn was never photographed once in this

17  case at all in either of those vehicles, was he?

18  A    No, sir.

19  Q    He was never observed by any agent from any agency of

20  which you are aware possessing drugs in either vehicle?

21  A    No, sir.

22  Q    And is never observed by agents from either agency

23  transporting drug proceeds in either vehicle, correct?

24  A    No, sir.

25  Q    There is no way that you can say that Mr. Dunn used

1   either vehicle to transport drug proceeds, correct?

2   A    I cannot say that.

3   Q    And you can't say that Mr. Dunn used either vehicle to

4   buy or sell drugs, correct?

5   A    I cannot say that, no.

6   Q    And there is likewise -- strike that.

7           And in terms of the cash found inside the trunk on

8   direct examination in the back of the '74 Caprice, you don't

9   know, and by you I mean the collective government agencies --

10  let me do this.  You don't know personally how that cash got

11  in the back of the trunk, do you?

12  A    No, sir.

13  Q    You don't know who put it there, do you?

14  A    No, sir.

15  Q    You don't know personally where that cash came from?

16  A    No, sir.

17  Q    All right.  Let's talk about the search of the 8717

18  Kentucky address.  You actually did not assist in the search

19  of that address, did you?

20  A    I did not assist.  I was just -- I was there for some of

21  the search.

22  Q    You, in fact, were making the rounds in other locations

23  that night.  You had four search warrants that you were

24  delivering to different parts of the city, correct?

25  A    Yes, sir.

1    Q     And you weren't in charge of the search at 8717

2    Kentucky, were you?

3    A     I was not.

4    Q     As a matter of fact, you just delivered the search

5    warrant, correct?

6    A     I did, but I was there for a short time.

7    Q     You stayed outside, didn't you?

8    A     I went inside and I was in the garage.  In the picture

9    of the Caprice you can see my shoes in the photograph.  So I

10   was pretty close.

11   Q     Do you remember giving testimony during the suppression

12   hearing in this case?

13   A     Do I remember?

14   Q     Right.

15   A     Yes, I remember.

16   Q     You were a sworn witness at the suppression hearing,

17   correct?

18   A     Yes, sir.

19   Q     And you were placed under oath, correct?

20   A     Yes, sir, always.

21   Q     And you were sworn to tell the truth?

22   A     Yes.

23   Q     Which you did to the best of your abilities, correct?

24   A     Yes, that's right.

25   Q     And you were asked questions during the course of the

1    suppression hearing about the execution of the warrant at 8717

2    Kentucky, do you remember that?

3    A    No, sir, I don't remember.

4    Q    You don't remember that?

5    A    No.

6    Q    Would it refresh your recollection if I were to show you

7    some of your testimony about the 8717 warrant execution?

8    A    Sure, that would be fine.

9    Q    I am showing you what has been marked for identification

10   as Exhibit No. 12.

11          MR. CARPENTER:  Your Honor, can I approach the

12   witness?

13          THE COURT:  You may.

14   BY MR. CARPENTER:

15   Q    And if I could ask you to look at Page 55, lines 2

16   through 13.

17   A    Yes, sir.

18   Q    Does that refresh your recollection about your testimony

19   at the suppression hearing about the execution of the search

20   warrants at 8717 Kentucky on June 12th, 2009?

21   A    Yes, sir.

22   Q    And that indicates that you testified, does it not, that

23   you delivered the warrant and you remained outside the house?

24   A    That's what it says.

25   Q    And it says you didn't participate in the search of that

1    residence, correct?

2    A    And that's what I testified to today also.  I didn't

3    participate in the search.

4    Q    Well, you said you went inside, but at the suppression

5    hearing you indicated you remained outside the whole time,

6    correct?

7    A    That's what it says.  I was younger, my mind was fresher

8    at that point.

9    Q    It's eight years ago, I understand.

10        And if I could also direct your attention to Page 43

11    of Exhibit 12, lines 21 through 23, I believe.  Actually 13 to

12    21.

13    A    Page 43, lines 13 to 21?

14    Q    Well, let me get there with you.  Strike that, I'm

15    sorry.  Page 45, a lot of 40's.  Lines 13 to 21.

16    A    Yes, sir.

17    Q    Can you take a look at that real quick?

18    A    Yes, sir.  Page 43, lines 13 through 21?

19    Q    45, lines 13 to 21.  I'm sorry.

20    A    Okay.

21    Q    That again indicates that you weren't hands on involved

22    -- sorry.  Does that refresh your recollection about your

23    testimony at the suppression hearing about the search of the

24    trunk of the Caprice at 8717 Kentucky on June 12th, 2009?

25    A    That is exactly what I am testifying to now.

1   Q    That indicates that you were not involved in the search,

2   correct?

3   A    That's right.

4   Q    You stood outside while other people executed the

5   search, correct?

6   A    I was there for the search for the Caprice.  I wasn't

7   hands-on.  I stood there and observed.

8   Q    Well, you weren't even in the garage, where you?

9   A    Yes, I was.

10  Q    I'm sorry.  I was standing out -- can you read lines 19

11  through 20 aloud?

12  A    When you open the garage door, I mean it is semantics

13  there.  The garage door opens, the back of the car is right

14  there.  If I'm standing right at the entry to the garage

15  looking in the trunk.

16  Q    How far were you standing outside the garage?

17  A    You can see my shoes in the picture right by the back

18  end of the car.

19  Q    How do you know those are you shoes?

20  A    I just wore them the other day.  I still have the same

21  shoes.

22  Q    You've got old shoes like I do.

23  A    I'm using them to cut the grass now though.

24  Q    Well, we all rotate them down.  I know how that works.

25           THE COURT:  How much more time do you have with this

1  witness on cross, counsel?

2      MR. CARPENTER:  I think I've only got about 15 or 20

3  minutes.  Do you want to take a break Your Honor or should we

4  roll through it?

5      THE COURT:  Yeah, I do.  Why don't we take about a

6  10 minute break and then we will come back out and we will

7  have you finish up.

8      MR. CARPENTER:  Thank you, Your Honor.

9  (THEREUPON, a short recess was had; WHEREUPON, the following

10  proceedings were had.)

11      THE COURT:  The Court will remind the witness that

12  you are still under oath.  Counsel.

13      Did you say 20 minutes?

14      MR. CARPENTER:  Ten.

15      THE COURT:  Okay.

16  BY MR. CARPENTER:

17  Q    Agent King, we just have a couple more matters to cover

18  before we are done.  I appreciate it.  Question:  When you

19  executed the warrant on June 12th, 2009, at the 8717

20  property, at that time your agency had identified the person

21  identified as A.D. in recordings as Adrian Dunn at that point,

22  had you?

23  A    Yes, I believe we had.

24  Q    Okay.

25  A    I believe we had.

1     Q     At what point did that occur?

2     A     I'm sorry.

3     Q     At what point did that occur?

4     A     I can't tell you, it's been too long.

5     Q     Let's talk about the cash.  And if I could, could I have

6     the government put up one of the exhibits showing the cash

7     that is already in evidence?

8            MR. BOHLING:  They are in our binder.  So for

9     example, here is Exhibit 11, here is Exhibit 10, and the Judge

10    will have those.

11           MR. CARPENTER:  I will just pull it out of my binder

12    here.

13           MR. BOHLING:  Not on a computer today, I'm afraid.

14           THE COURT:  Are you looking for the photographs?

15           MR. CARPENTER:  I am.  I am.  I've got them right

16    here.

17           THE COURT:  Is that for the witness or for me?

18           MR. CARPENTER:  It's for the witness, Your Honor.

19           THE COURT:  Okay.

20    BY MR. CARPENTER:

21    Q     All right.  We testified -- we established that you were

22    standing outside the garage at the time the trunk of the '74

23    Caprice was open in the garage at the 8717 Kentucky property,

24    correct?  And they found inside the trunk a plastic dollar

25    general store bag, correct?

1    A    Yes, sir.

2    Q    And it was just sitting there in plain view in the back

3    of the trunk, wasn't it?

4    A    It was kind of tucked behind the speaker box, tucked to

5    the side of it.

6    Q    It wasn't hard to see when you opened the trunk, was it?

7    Or do you know were you close enough to even tell?

8    A    I can't tell you how easy it was to see.

9    Q    Well, let's take a look.  I'm going to use Government's

10   Exhibit No. 8 which is already in evidence.  And I'm going to

11   get this out.  You've got a copy of it up there, correct,

12   Agent King?

13   A    Yes.

14   Q    Can you take a look at Government Exhibit No. 8.  You

15   testified that that shows the bag containing cash that was

16   found in the trunk of the '74 Caprice when the search was

17   executed, correct?

18   A    Yes, sir.

19   Q    And looking down this is from taken from a perspective

20   of about person height looking down into the trunk, correct?

21   A    Yes, sir.

22   Q    And you can see the bright yellow bag sitting right in

23   the trunk, not tucked very far behind the speaker at all,

24   right?

25   A    Yes, sir.

1    Q    It is plainly visible at the moment you open the trunk,

2    isn't it?

3    A    Yes, sir, but from the way I remember it was tucked

4    further behind the speaker.  I think someone pulled it out to

5    get a shot of it.

6    Q    So this is not an accurate picture then of how you

7    found.

8    A    I didn't find the money.

9    Q    You weren't involved in the search, were you?

10   A    I was just there.  I observed it.  You would have to get

11   -- I couldn't testify as to how it was concealed.  That is not

12   the way I remember it, but I think it was tucked more behind

13   the speaker.

14   Q    Is there any photographic evidence of this bag tucked

15   more behind the speaker?

16   A    Maybe that is how it was.

17   Q    Wouldn't your agency have taken contemporaneous

18   photograph of how you found the evidence before you started

19   moving it around?

20   A    Perhaps that's how it was and I'm mistaken.

21   Q    Fair enough.  So it is pretty much in plain site when

22   you open the trunk, isn't it?

23   A    Yes, sir.

24   Q    And inside that Dollar General bright yellow bag is US

25   currency, right?

1    A    Yes, sir.

2    Q    And you didn't count that currency, did you?

3    A    The bank counts it.  We don't count the cash.  We take

4  it to the bank that way there are no mistakes as far as

5  counting.

6    Q    You've got no first-hand knowledge of what that currency

7  was, do you?

8    A    I have a count sheet from the bank.

9    Q    The bank told you?

10    A    Broken down into denominations and the total amount.

11    Q    Fair enough.  Your investigation during operation

12  Blockbuster recovered currency being transported by the same

13  drug conspiracy previously, didn't you?

14    A    I'm sorry?

15    Q    During the course of operation Blockbuster, your agency

16  intercepted drug proceeds in the form of cash being

17  transported by vehicles by members of the conspiracy

18  previously, correct?  Particular I am talking about in May

19  6th, of 2009, you began surveilling a Toyota sienna minivan,

20  do you remember that?

21    A    Yes, sir.

22    Q    And you observed it parked at an abandoned house at 920

23  Ewing, correct.

24    A    It wasn't an abandoned house.

25    Q    But it was parked at a house at 920 Ewing?

```
1    A    Yes, sir.

2    Q    And you had it under surveillance, correct?

3    A    Yes, sir.

4    Q    And you could see, could you not that there was quite a

5    bit of work going on on this minivan?

6    A    Yes, sir.

7    Q    They were taking things on and off and doing something

8    correct?

9    A    Yes, sir.

10   Q    And it was a little far for you to see exactly what they

11   were doing at the time of the surveillance, right?

12   A    Yes, sir.

13   Q    But you knew they were doing something?

14   A    Yes, sir.

15   Q    And this is part of the Corredor drug conspiracy, right?

16   A    Correct.

17   Q    And then you followed the van when it left the Ewing

18   address, correct?

19   A    That's correct.

20   Q    And you intercepted the van after a while and stopped it

21   on the highway, right?

22   A    Yes, sir.

23   Q    And you found $653 in US currency inside that minivan,

24   correct?

25   A    $653,000, yes.
```

1    Q    I'm sorry.  You're right.  Did I say $653?

2    A    Yes, sir.

3    Q    I'm sorry.  And that $653,000 dollars that you found was

4    it sitting in the trunk of the minivan?

5    A    No, sir.  But the circumstances were totally different

6    too.

7    Q    Well, as a matter of fact where was that money located

8    inside the sienna minivan?

9    A    A false compartment in the firewall accessed through the

10   fender, taking the fender off.

11   Q    I'm going to show you some pictures.  Before I do,

12   basically, what they had done is they had cut out a hole in

13   the frame of the vehicle, hadn't they?

14   A    No, sir.  It wasn't in the frame.  Through the firewall

15   there was a rectangular box that ran the full length behind

16   the dashboard.

17   Q    Was it the quarter panel, the right front quarter panel?

18   A    Yes.

19   Q    And they cut it out and then stuffed the currency inside

20   the quarter panel itself, correct?

21   A    Yes, sir.  It was in this box accessible behind the

22   front quarter panel.

23   Q    And it was a big gap, it was about over 60 inches deep,

24   correct?

25   A    I believe it ran from side to side.

1    Q    And it was welded shut, correct?

2    A    No, sir.

3    Q    It wasn't welded shut?

4    A    No, I think that was just some temporary -- a plate was

5    put over there but it wasn't welded.

6    Q    It was a plate with some sort of adhesive on it?  I've

7    got what is marked for identification as Exhibit No. 23.  I'm

8    handing a copy to the government's counsel.  Can I approach

9    the witness, Your Honor?

10        THE COURT:  You may.

11   BY MR. CARPENTER:

12   Q    Agent King, do you recognize what is contained in that

13   photograph?

14   A    Yes, sir.

15   Q    And what is that?

16   A    That is the minivan you were talking about from which we

17   seized $653,000.

18   Q    And is that a fair and accurate representation of the

19   minivan that you seized that contained the $653,000 dollars in

20   currency?

21   A    It appears to be, yes.

22        MR. CARPENTER:  Your Honor, we offer Exhibit 23 into

23   evidence.

24        MR. BOHLING:  No objection.

25        THE COURT:  Plaintiff's Exhibit 23 shall be

1  admitted.

2          (THEREUPON; Plaintiff's Exhibit No. 23 was then

3  admitted into evidence by the Court.)

4  BY MR. CARPENTER:

5  Q    And I'm holding hat has been marked for identification

6  as Exhibit No. 24.

7          MR. CARPENTER:  Can I approach the witness, Your

8  Honor?

9          THE COURT:  You may.

10  BY MR. CARPENTER:

11  Q    You know what to save time let me -- I have one more

12  exhibit -- two more, three more.  Exhibit 25, 26, and 27.  I'm

13  giving copies to the government counsel.

14          MR. CARPENTER:  If I could approach the witness

15  again, Your Honor?  And I have Exhibit 28 as well.

16  BY THE WITNESS:

17  A    Is there a 26?

18  BY MR. CARPENTER:

19  Q    I may not have given you a 26.  Hold on one second.

20          Agent King, do you recognize what is contained in

21  Exhibit No. 25?

22  A    Yes, sir.

23  Q    What is that a photograph of?

24  A    That is the panel on the Toyota sienna minivan.  You

25  take the fender off and that's the panel that accesses the

1   false compartment where $653,000 dollars was concealed.

2   Q    And that is in the compartment enclosed form, correct?

3   A    Yes.

4   Q    And do you recognize -- is that a fair and accurate

5   representation of the panel that you found on that Toyota

6   minivan?

7   A    Yes, sir.

8          THE COURT:  Let me ask, what exhibits does he have?

9          MR. CARPENTER:  He has 25, 26, 27, and 28 Your

10  Honor.

11         THE COURT:  Did you not say 24?

12         MR. CARPENTER:  And 23 as well.

13         THE WITNESS:  I have 23 through 28, Judge.

14         MR. CARPENTER:  I don't think I gave him 24.

15         THE COURT:  23 was admitted.

16         MR. CARPENTER:  Yep.

17         THE COURT:  I thought you said 24, 25, 26.

18         MR. CARPENTER:  I think I gave him 24 as well.

19         THE COURT:  Have him look at them all.

20         MR. CARPENTER:  Yeah.  And save some time.

21         THE COURT:  Yes.

22  BY MR. CARPENTER:

23   Q    Can you take a look and see if those accurately

24  represent that Toyota sienna we talked about and if they are

25  fair and accurate representations?

1    A    Yes.

2    Q    Great.

3            MR. CARPENTER:  Your Honor, we would offer 24, 25,

4    26, 27, and 28 into evidence.

5            MR. BOHLING:  No objection.

6            THE COURT:  Plaintiff's Exhibits 24 through 28 shall

7    be admitted.

8            (THEREUPON; Plaintiff's Exhibit Nos. 24 and 28 were

9    then admitted into evidence and published to the Court.)

10            MR. CARPENTER:  And can we publish these, Your

11    Honor?

12            THE COURT:  You may.

13    BY MR. CARPENTER:

14    Q    I'm pulling up Exhibit No. 23, and I think we have

15    already established that is the Toyota sienna minivan that you

16    intercepted that contains $653,000 in US currency, correct?

17    A    Correct.

18    Q    And let's see 24.  What does that show?  Is that the

19    hidden compartment within the right front quarter panel of the

20    vehicle that you entered?

21    A    Yes, sir.

22    Q    And did you open that panel once you had intercepted it?

23    A    I did not personally.

24    Q    Can we see No. 25 please.  And is that another view of

25    the same quarter panel?

1    A    Yes, sir, just a close up.

2    Q    And do you know what it is sealed with?

3    A    I do not.

4    Q    Okay.  Exhibit No. 26.  And this is the same quarter

5    panel and the same Toyota sienna with the cover removed,

6    correct?

7    A    Yes, sir.

8    Q    And agents, not necessarily yourself, but agents

9    associated with your investigation after they had impounded

10   the vehicle, stripped it down and found the secret

11   compartment, right?

12   A    Yes, sir.

13   Q    And they opened the secret compartment, correct?

14   A    Yes, sir.

15   Q    And inside they saw this, correct?

16   A    Yes, sir.

17   Q    And what is that inside?

18   A    US currency, bundles of US currency.

19   Q    Approximately $653,000 dollars worth, right?

20   A    Yes, sir.

21   Q    No. 27.  And is this an example of the currency taken

22   out of the hidden compartment in the Toyota sienna?

23   A    Yes, it is.

24   Q    And you can see that it is wrapped in saran wrap, isn't

25   it?

1    A    Yes, sir.

2    Q    And if you can see it in the last picture, but I think

3    you can see that it was also in addition wrapped in saran wrap

4    and secured with duck tape as well, correct?

5    A    Yes, sir.

6    Q    Duck tape is the silver stuff that we saw earlier,

7    correct?

8    A    Yes, sir.

9    Q    We are looking now at Exhibit No. 28.  That another view

10   of the currency saran wrapped and duct taped.  It's very

11   tight, isn't it?

12   A    Yes, sir.

13   Q    They are trying to wedge as much as they can in,

14   correct?

15   A    That's correct.

16   Q    That's a lot of effort to hide currency, isn't it?

17   A    Yes, sir.

18   Q    It's a very deliberate system of hiding currency for

19   transportation, isn't it?

20   A    Yes, sir.

21   Q    It's not loose, is it?

22   A    No, sir.

23   Q    Tightly wrapped, correct?

24   A    Yes, sir.

25   Q    Not in plain sight in the trunk or the interior of the

1   vehicle, correct?

2   A    That's right.

3   Q    Now, the Chevrolet Caprice was searched top to bottom

4   when you executed the search warrant, correct?

5   A    I would believe so.

6   Q    That's true, you were outside.  I beg your pardon.  When

7   the Chevrolet Caprice was impounded though, it was searched

8   top to bottom for false compartments, correct?

9   A    Yes.

10  Q    You would have found a false compartment containing

11  cash, drugs or contraband if it was in the Caprice, correct?

12  A    No, sir.

13  Q    You wouldn't have?

14  A    No, not necessarily.  It would've been very difficult to

15  find.

16  Q    Fair enough.  But you would've looked for it, correct?

17  Your agency would have looked for it?

18  A    Yes.

19  Q    And you didn't find anything like that in the Caprice?

20  A    No.

21  Q    No secret compartments?

22  A    No.

23  Q    No money hidden inside the quarter panels of the body or

24  the fire space of the car, correct?

25  A    No, sir.

1    Q    And the cash in the Dollar General store bag, that was

2    loose, wasn't it?

3    A    I can't say.

4    Q    It certainly wasn't saran wrapped and duck taped, was

5    it?

6    A    No, sir.

7    Q    Very different than what we saw from this mode of

8    transportation, correct?

9    A    That's correct.

10   Q    Fair to say the method of storing the money that you

11   encountered from that sienna minivan was markedly different

12   than what you found in the back trunk of that '74 Caprice?

13   A    Yes, sir.

14   Q    As a matter of fact during your entire operation in the

15   investigation of operation Blockbuster, you never found drug

16   proceeds stored just sitting in plain view in somebody's

17   trunk, did you?

18   A    No, sir.

19   Q    Now, the Corvette that you seized wasn't even located at

20   8717 address, was it?

21   A    No, sir.

22   Q    It was seized from 98th Street in Kansas City, Missouri?

23   A    Yes, sir.

24   Q    You didn't find any cash in that vehicle, did you?

25   A    Not that I'm aware of.

1    Q    No false quarter panels?

2    A    No, sir.

3    Q    No secret compartments?

4    A    No, sir.

5    Q    You found no drugs inside that Corvette when you found

6    it, right?

7    A    Not to my knowledge.

8    Q    We talked at the beginning of our discussion about the

9    size and scope of operation Blockbuster.  It was a big one.

10   You wouldn't call it Blockbuster if it was a small operation

11   obviously, that would make no sense, right?

12   A    That's wasn't the reason it was named Blockbuster, but I

13   can see your point.

14   Q    Fair enough, I won't go into that.  Operation

15   Blockbuster cost a lot, didn't it?

16   A    Cost a lot as far as federal expenses?

17   Q    Let's break it down.  Man-hours, you were working

18   primarily on operation Blockbuster for a while, weren't you?

19   A    Yes, sir.

20   Q    About how long?

21   A    We discussed that earlier, about a year.

22   Q    And year you were primary.  That was your main focus on

23   your work for the government so that is thousands of

24   man-hours, right?

25   A    Yes, sir.

1   Q    And you weren't the only one, you had other agents

2   working.  If not full-time, significant amounts of their time

3   on operation Blockbuster?

4   A    That's correct.

5   Q    And it wasn't just Homeland Security, it was the DEA as

6   well, correct?

7   A    Yes, sir.

8   Q    And the KCMO, state and local, they pitched in as well.

9   Took a lot of manpower, right?

10  A    Right.

11  Q    So in terms of man power cost, it was a lot, right?

12  A    Sure.

13  Q    And wiretaps are expensive too, aren't they?

14  A    Yes, they are.

15  Q    Why are wiretaps so expensive?

16       MR. BOHLING:  Your Honor, I'm going to object at

17  this point.  I think this is all self-evident from what has

18  been in testimony.

19       THE COURT:  Yeah.  Counsel, we are we going?  Just

20  get to the point.  I mean, I've heard it.

21       MR. CARPENTER:  I will, Your Honor.

22  BY MR. CARPENTER:

23  Q    Operation Blockbuster costs a lot of money, didn't it?

24  A    Yes, sir.

25  Q    Any idea what it costs the government out of pocket to

1　put operation Blockbuster on?

2　　　　　THE COURT:  Counsel, get to the point.

3　　　　　MR. CARPENTER:  All right.

4　　　　　THE COURT:  Get to your point.

5　BY MR. CARPENTER:

6　Q    My point is you can't put on these expensive undercover

7　operations without sources of revenue from civil forfeitures,

8　can you?  Forfeitures are a critical source of revenue for you

9　to be able to do the work that you do, correct?

10　A    None of the money used on this investigation came from

11　asset forfeitures.

12　Q    Well, you would agree with me, wouldn't you, that the

13　Department of Justice views asset forfeiture as an important

14　means of funding certain departmental state and local law

15　enforcement activities, correct?

16　　　　　MR. BOHLING:  Objection.

17　　　　　THE COURT:  Yes.

18　　　　　MR. BOHLING:  He has answered that none of the money

19　came from the asset forfeiture fund.

20　　　　　MR. CARPENTER:  That's not the question I asked.

21　　　　　THE COURT:  What is your point?

22　　　　　MR. CARPENTER:  My point is --

23　　　　　THE COURT:  -- relevant to me making a decision on

24　whether or not --

25　　　　　MR. CARPENTER:  My point --

1          THE COURT:  -- don't interrupt me.

2          MR. CARPENTER:  I'm sorry.

3          THE COURT:  Whether or not this evidence suggests

4    preponderance of the -- they have met their burden.  That is

5    what the Court is determining.  Right?  I'm not determining

6    policy, I'm making a factual determination of whether what the

7    government presented has met the burden to justify this being

8    forfeited or otherwise they have entitled to this.  Whether on

9    41 or anything else.

10         Now, with that said, tell me how that is relevant to

11   the decision I have to make?  Unless you disagree with what my

12   job is right now?

13         MR. CARPENTER:  Well, yeah, Your Honor, this goes to

14   motive and the reason why the government is so eager to take

15   assets.  The government is addicted to asset forfeiture.

16         THE COURT:  I don't care.  I don't care what -- what

17   I care about is the evidence and this is what you're asking

18   me.  Do you want me to start going down that road?  The

19   evidence you're asking me have they met their burden?  Is that

20   not why I'm here?

21         MR. CARPENTER:  That is the key issue.

22         THE COURT:  Well, then that's what we need to focus

23   on.  Evidence to support that this somehow was part of this

24   criminal enterprise and they need to show that.  That's what

25   where we need to focus.

1          MR. CARPENTER:  I am hearing that you are not seeing

2    the relevance in this one, so I'm going to move on from this.

3          THE COURT:  You think?

4          MR. CARPENTER:  After a while I get the picture.

5          THE COURT:  Okay.

6          MR. CARPENTER:  You know, what?  I may be done.  Let

7    me confer with my counsel and see if there's anything else.

8          THE COURT:  Okay.  And this ten minutes has turned

9    into a long ten minutes.

10          MR. CARPENTER:  I'm just conferring with my client

11    to see if I needed to ask anything else, Your Honor.

12          THE COURT:  Okay.

13          MR. CARPENTER:  And we are done.

14          THE COURT:  Okay.  Counsel.

15          MR. BOHLING:  Thank you, Your Honor.  I'll be brief.

16                    REDIRECT EXAMINATION

17    BY MR. BOHLING:

18    Q    Agent King, I'd first like to direct your attention back

19    to Exhibits 4 and 5 which is the intercepted conversation.

20    Those were in fact trial exhibits, correct?

21    A    I'm sorry?

22    Q    Trial exhibits, exhibits at the trial?

23    A    Yes, sir.

24    Q    And they were Exhibits I think 123 and 124?

25    A    That sounds right.

1    Q    Did you review them for trial?

2    A    I did.

3    Q    And did you review them before the hearing today?

4    A    I did.

5    Q    Are they the same?

6    A    They are.

7    Q    Okay.  Do you have any reason to believe that these

8    conversations are any different than they have you ever been?

9    A    I do not.

10   Q    Now, with regard to that particular conversation on

11   June 9th, would it be fair to say that some conversations are

12   more important than others when you intercept them?  You give

13   more importance to them?

14   A    Yes, sir.

15   Q    Was this one that you gave more importance to?

16   A    Do I give this one more importance?

17           MR. CARPENTER:  Objection, relevance.

18           THE COURT:  Overruled.

19   BY MR. BOHLING:

20   Q    At the time, during this investigation?

21   A    It's like pieces to the puzzle.  That's a piece to a

22   puzzle.  And to me it explains the $41,000 in the trunk of Mr.

23   Dunn's car.  So in that regards, yes, it is a piece of a

24   puzzle.

25   Q    Okay.  And in that regard, you are talking about the

1    mention of the 41 several times during the conversation?

2    A    Yes.

3    Q    And there seems to be some discussion of some debt

4    between the two?

5    A    Yes.

6    Q    Okay.  Now, when you went to that scene did the fact

7    that this conversation had been intercepted, was that in your

8    mind when you went to the scene?

9    A    No, sir.

10   Q    Okay.  Was the fact that the money was found, did that

11   tie back up to you to the intercepted conversation?

12   A    Yes, sir.

13   Q    And didn't you mention -- did you mention that you had

14   some kind of bet?

15   A    That I had a bet?

16   Q    Yes.

17         MR. CARPENTER:  Objection, relevance.

18         THE COURT:  I'm going to overrule.

19   BY MR. BOHLING:

20   Q    Was it as to this money?

21   A    I'm sorry?

22   Q    Was it as to his money?  Am I remembering that

23   correctly?

24   A    I had a bet with another officer how much money was in

25   the bag and I lost a six pack.  That's the only thing.

Denise Carroll Halasey CCR, CVR-CM

Case 4:16-cv-00493-BCW STONEBURNER vs. Document 50 STONEBURNER Filed 08/28/17   Page 120 of 176

1    Q    Okay.  Now, I would like to turn your attention to the

2   Corvette.  The location where the Corvette was seized from, we

3   had a discussion on that on cross-examination.  Who was

4   associated with that residence?

5    A    The Corvette, that was at Mr. Corredor's house.

6    Q    In Kansas City, Kansas?

7    A    Yes, sir.

8    Q    Okay.

9         MR. BOHLING:  And now, Your Honor, I'm going to ask

10  a series of questions where we are going to have a

11  disagreement about their admissibility.  I'd like to do that

12  at least as an offer of proof.  It also would allow me to call

13  the other agent and get this over a little quicker.  They have

14  the same information.  I understand that there will be an

15  objection and I respect that.

16        THE COURT:  Okay.

17        MR. BOHLING:  But I'd at least like to get it on the

18  record as an offer of proof.  And then we can deal with that.

19        MR. CARPENTER:  Sure.  When you would like me to

20  listen to the argue of proof and object later or object now?

21        THE COURT:  We'll just let the offer of proof and

22  then we will object.

23  BY MR. BOHLING:

24   Q    Now, as to the Corvette we all know that Mr. Corredor

25  cooperated with the government?

1    A    Yes, sir.

2    Q    And as part of that cooperation he was subject to a

3    series of proffers by government agents?

4    A    Yes, sir.

5    Q    And you were present at most of those?

6    A    Yes, sir.

7    Q    And you read the reports of the proffers in any case?

8    A    I have.

9    Q    Do you know whether this Corvette was discussed with Mr.

10   Corredor during one of those proffers?

11   A    Yes, it was.

12   Q    And what did Mr. Corredor say about the Corvette?

13   A    He said that Mr. Dunn had owed him over $100,000 dollars

14   at one point.  And he took two vehicles from Mr. Dunn as

15   payment towards his drug debt.  And one was a conversion van

16   that he gave him $20,000 credit, and the other one was the

17   Corvette which he gave him $40,000 credit for.

18   Q    So essentially, according to Mr. Corredor, the Corvette

19   was a payment from Mr. Dunn to him for a drug debt?

20   A    Yes, sir.

21        MR. BOHLING:  And now I understand that they would

22   object to that testimony.

23        MR. CARPENTER:  We do.  It is classic hearsay.

24        THE COURT:  Would you like to ask him any questions?

25        MR. CARPENTER:  Yeah, on that subject?

```
 1            THE COURT:  Yes.

 2            MR. CARPENTER:  I have a substantive

 3   cross-examination, but in terms of the -- I would like to ask

 4   you a few.

 5            THE COURT:  Go ahead.

 6   BY MR. CARPENTER:

 7    Q    You were not present for --

 8            THE COURT:  -- what do you mean a substantive cross?

 9            MR. CARPENTER:  I have a couple recrosses on the

10   theory that the vet is for payment for drug money that I would

11   like to ask him about.  I can do it now since this is a bench

12   procedure.  I can do it now or I can do it later.

13   BY MR. CARPENTER:

14    Q    But my point on this is that, Agent King, you were not

15   present when this statement by Mr. Corredor was allegedly

16   made, were you?

17    A    That's correct.

18            MR. BOHLING:  That's right, Your Honor.  We're only

19   trying to -- I would represent to the Court and to counsel

20   that Agent Casner's testimony would be the same.  And it is

21   memorialized in her report that is actually marked in

22   evidence.

23            THE COURT:  Okay.

24            MR. BOHLING:  I'm only trying to save time.  I am

25   happy to call her for purposes of this hearing.
```

1          THE COURT:  No, that will be cumulative.  And this

2     is what she will testify about.

3          MR. CARPENTER:  And it is still hearsay.

4          MR. BOHLING:  Right.

5          THE COURT:  Okay.  Calm down a second.  Counsel, you

6     gotta stop talking over forks.  We have a court reporter here.

7          MR. CARPENTER:  Sorry, I'll --

8          THE COURT:  There you go again.  And have a seat.

9     You are wondering around too much.  I don't like that in the

10    courtroom.  Go from the podium to the seat, please.  That's

11    how we lose control of the courtroom.  And it's not fair to my

12    court reporter if you're talking over folks.  She's got to

13    keep a record.  Thank you.

14         So with respect to that, I know there is an

15    objection is to hearsay whether this witness, Special Agent

16    King testified or whether your other witness would testify,

17    anything related to that conversation then I understand there

18    is an objection to it.  And I understand what the objection,

19    and Mr. Carpenter if you want to make a fuller objection to

20    that, you are free to do so.  If you want to put more on the

21    record, you can do so at this time.

22         MR. CARPENTER:  Well, why don't I do it now.

23         THE COURT:  Yes.

24         MR. CARPENTER:  Clearly hearsay, it's an

25    out-of-court declarative statement offered for the truth in

1    the matter asserted.  No one denies that.  Actually I don't

2    think the government denies that it is inadmissible under the

3    rules of evidence.  And either the rules of evidence apply to

4    this case or they don't.  There's no halfway or sometimes it

5    does or it doesn't.  There is no exception to which this

6    applies.  And the problem is with this proffer it is hearsay

7    within hearsay.  The document itself is hearsay.  And the

8    statements which all began, Mr. Corredor represents, Mr.

9    Corredor states, those are also hearsay.  There is no

10   exception that applies to let either one of them in.

11          There are plenty of cases, US v. Taylor, is one,

12   that is 462 F.3d at 1023, to indicate that even if there was

13   someway they could get the proffer itself in, the statements

14   contained inside are double hearsay and are completely

15   inadmissible.

16          So our only point is this is incredibly prejudicial

17   to us.  What we have is the third hand testimony of a

18   convicted drug dealer, murderer.  Mr. Corredor ordered a hit

19   as we know on another person.  This is not a reliable source.

20   This is a gentleman who was faced with the death penalty and

21   gave state evidence and was doing what he could to avoid the

22   death penalty in this case.  He has absolutely motivation

23   history of dishonesty and motivation to lie.  So there is no

24   reliability to it.  What is even worse is we can't

25   cross-examine him.  We can't put Mr. Corredor up and cross

1    him.

2         For instance, this is a statement and I can do this

3    with Mr. King, this statement came in in September of 2009, it

4    was after they had already taken the Corvette.  It is not

5    contemporaneous.  It wasn't anywhere in the trial.  No one at

6    trial testified that the Corvette was given for drug proceeds.

7    This is a red herring that has been after-the-fact put up and

8    we can't cross on it.  So that is what makes it particular

9    devastating.

10         In addition there is no foundation.  Agent King

11   wasn't even present or around when the statements were made.

12   That wouldn't make it not hearsay if he wasn't present.  But

13   he can't even, doesn't even have the foundation to offer any

14   firsthand testimony about it.  The other woman outside does,

15   but it is still hearsay.

16         This is tremendously prejudicial critical evidence

17   terribly unfair to my client that they are doing this without

18   giving us the opportunity to test the veracity and

19   truthfulness of Mr. Corredor.  When at the end of the day what

20   it comes down to is my client's word versus Mr. Corredors.  So

21   I think we already -- if the rules of evidence apply, and they

22   must in fairness to take this man's property from him, this is

23   evidence that just come in on any theory.

24         THE COURT:  Thank you, counsel.

25         MR. BOHLING:  I'd like to take that issue up

1    probably in briefing.  I may agree with him actually.  It is a

2    convincing presentation.  I do think there are distinctions to

3    be made.  That this is a motion hearing and that you would

4    find precedence in a suppression hearing that are really

5    almost indistinguishable from what I have given you.  But I

6    want to think about that question thoughtfully because it is

7    important and I would like to weigh in on a paper filing

8    shortly after the hearing on that issue.

9         THE COURT:  Okay.  And we will talk about that after

10   we finish with the evidence portion.

11   BY MR. BOHLING:

12   Q    I did want to ask you about the money taken from the

13   car, from the Caprice, the $41,000 dollars, do you recall even

14   approximately what the denominations of those funds were?

15   A    Yeah, I'd look to refresh my memory.  There was a

16   variety of different dominations.  The predominant one were

17   there were more than 1300 $20 dollar bills.  And all the

18   dominations were less than $100 and $50 amount.

19   Q    Okay.  And do you know whether or not there was a drug

20   dog that was brought to that money?

21        MR. CARPENTER:  Objection, lack of foundation.  And

22   it's hearsay.  He was not present.

23        THE COURT:  What is the question again?

24        MR. BOHLING:  Whether he knows if there was a drug

25   dog.  I haven't ask him about any results.

         1          THE COURT:  He can ask if he knows.  And then we

         2     wait to see what he says.

         3          MR. CARPENTER:  That's hearsay.

         4          THE COURT:  Overruled, you can ask the question.

         5     BY MR. BOHLING:

         6      Q    Do you know?

         7      A    I was there.  I don't remember a drug dog.

         8          THE COURT:  There it is.

         9          MR. CARPENTER:  That solves the problem, Your Honor.

        10          THE COURT:  It solves it because it is premature.

        11     So that's what I'm saying.  It's a foundational question, it's

        12     not a hearsay question.  He doesn't know and we move on

        13     counsel.

        14     BY MR. BOHLING:

        15      Q    One last series of questions, if I may.  We talked about

        16     the $653,000 dollars that was seized from the van?

        17      A    Yes, sir.

        18      Q    And you indicated during your testimony that the

        19     circumstances of that seizure were different, I presume from

        20     the circumstances of the seizure of the $41,000 dollars, how

        21     was that so?

        22      A    So Mr. Corredor was supplied with cocaine by the Mexican

        23     cartels that he would distribute that cocaine to his

        24     customers, and those customers would distribute to their

        25     customers, and then there was a process where they would

1    collect the money.  And eventually that money would make it

2    back to Mr. Corredor.  Mr. Corredor would give it back to

3    somebody who represents the cartel.  They would take that

4    money and they would have to prepare it.  The majority of

5    these proceeds that go back to the cartel go back through bulk

6    cash smuggling.  And the way they do that there is a bigger

7    risk because you're putting together large quantities of

8    money.  $653,000 was a lot more than $41,000.  $41,000 would

9    have eventually been put into a larger collection of money.

10   Well, that money has to be packaged tight, and it's going to

11   be going to certain individuals.  And it is marked, they

12   conceal it.  And because it's gotta to go from Kansas City to

13   Mexico, and you have a lot of law enforcement agencies working

14   the highways doing interdiction, and they use drug dogs so you

15   have to conceal it, you have to have false compartments, you

16   have to use things like pepper or axle grease carbon paper and

17   all these things to conceal the money because they don't want

18   to lose that big amount of money.  The $41,000 was going to be

19   given to Corredor.  Corredor and his associates would have to

20   count the money to make sure the count was right.

21           MR. CARPENTER:  Objection, speculation, Your Honor.

22           THE COURT:  Hold on.

23           THE WITNESS:  Sorry.

24           THE COURT:  I'm going to sustain.  Just ask another

25   question.  I think you are running into a narrative.

1          MR. BOHLING:  Right.

2   BY MR. BOHLING:

3    Q    So if I understand what you're saying the larger amount

4   of money -- and that wasn't the only large amount of money

5   taken in this case, there were actually several large

6   seizures, right?

7    A    It was $1.6 million dollars that was taken off.

8    Q    And so that money is moving from Kansas City to Mexico

9   and therefore is at high risk of being intercepted on the

10  road?

11   A    Exactly.

12   Q    A local guy like Mr. Dunn, if it's Mr. Dunn or a local

13  person -- let's take it out of that context, but a local

14  person whose working locally and not directly with Mexico

15  would not have the same need for such extreme measures?

16   A    Yes.

17          MR. BOHLING:  Thank you.  If I may talk to my

18  counsel for just a moment?

19          THE COURT:  Yes.

20          MR. BOHLING:  Thank you.  That's all I have for

21  Agent King.

22          THE COURT:  Mr. Carpenter, any recross?

23          MR. CARPENTER:  I'll keep it very brief, Your Honor.

24          THE COURT:  I'm going to hold you to it.

25                  RECROSS-EXAMINATION

BY MR. CARPENTER:

Q    Let's talk about the Corvette.  I appreciate it.  You
testified at length at the criminal trial in this case,
correct?

A    Yes, sir.

Q    And you never testified once during the criminal trial
that that Corvette was given to Mr. Corredor by my client as
payment for drug debt, did you?

A    No, sir.

Q    12 law enforcement officers, 11 more besides yourself
testified as well, and none of them testified to that during
the criminal trial, did they?

A    Not to my knowledge, no, sir.

Q    And in all of the hundreds of hours of wiretaps, none of
those wiretaps indicate that that Corvette was given to Mr.
Corredor as payment for a drug debt?

A    No, sir.

Q    And you testified at length at the suppression hearing
in this case as well, correct?

A    I don't even remember the suppression hearing to be
honest with you.

Q    Right.  That is the document I gave you earlier to
refresh your recollection of the 8717 Kentucky sweep?

A    Yeah, I didn't see the whole document, I just saw a part
of it.

1    Q    Sure.  Sure.  I didn't really give you much time to read

2    it all, did I?

3    A    Yeah, I'd like to see where the document came from

4    actually.

5    Q    Sure.  I think it is an official document, but you don't

6    recall testifying at that suppression hearing either that

7    Mr. Dunn gave Mr. Corredor that Corvette as payment for a drug

8    debt, did you?

9    A    No, sir.

10   Q    Neither did anybody else at the suppression hearing, did

11   they?

12   A    No, sir.

13   Q    There is nothing in the record of the criminal case at

14   all indicating that Mr. Dunn gave that Corvette to Mr.

15   Corredor as payment for a drug debt, is there?

16   A    There has been no testimony.

17   Q    And Mr. Corredor testified at length during the criminal

18   trial, correct?

19   A    Yes, sir.

20   Q    He was the star witness, right?

21   A    Yes, sir.

22   Q    And he never testified that he got that Corvette --

23        MR. BOHLING:  -- Your Honor, we will stipulate that

24   he is right, there was no testimony at trial about the

25   Corvette.

1          MR. CARPENTER:  Fair enough.  That will save me

2     little time.

3     BY MR. CARPENTER:

4     Q    As a matter of fact, Mr. Corredor when asked how many

5     vehicles he had, he testified that he had four and he never

6     identified the Corvette, did he?

7     A    I'm sorry.  Could you repeat the question.

8     Q    Sure.  At the criminal trial Mr. Corredor was asked

9     about how many vehicles he owned and he identified that he

10    owned a Ford lariat, correct?

11    A    I don't remember his testimony about his cars from the

12    trial.  I would have to look at the transcript to refresh my

13    memory.

14    Q    We'll get to that in one second.  Do you remember

15    filling out an affidavit for probable cause for the search for

16    the 8717 Kentucky property?

17    A    Yes, sir.

18    Q    And in that affidavit you were sworn under oath, right?

19    A    Yes, sir.

20    Q    And you were telling the truth in that affidavit.

21    correct?

22    A    Always.

23    Q    Always.  And in part of that affidavit you testified

24    that a 2003 Ford conversion minivan was given to Corredor by

25    Dunn in payment for a drug debt, correct?

1   A    I haven't looked at that affidavit in a long time.

2   Q    Would it refresh recollection if I showed it to you?

3   A    Sure.

4   Q    Great.  That is marked as Exhibit No. 47 for

5   identification.  I made a copy for counsel.

6          MR. CARPENTER:  May I approach the witness, Your

7   Honor?

8          THE COURT:  You may.

9   BY MR. CARPENTER:

10  Q    Can you take a look at Paragraph 26, which is on

11  Page 11.

12  A    Okay.

13  Q    This is dated June 12th, 2009, correct?

14  A    Yes, sir.

15  Q    And this is the affidavit that you swore out to get the

16  search warrant for the 8717 Kentucky address, right?

17  A    Yes, sir.

18  Q    Let me know when you're done looking at Paragraph 26.

19  A    I'm done.

20  Q    And in that paragraph you state that you have

21  information that Dunn recently turned 2003 Ford conversion

22  styled minivan as payment for a drug debt, correct?

23  A    Yes.

24          MR. BOHLING:  Objection.  I'd like to ask counsel to

25  read the full sentence because that is important.

1          MR. CARPENTER:  Happy to.  Starting with the

2     beginning of Paragraph 26?

3          MR. BOHLING:  Yeah, that would be fine.

4          MR. CARPENTER:  Sure.

5     BY MR. CARPENTER:

6     Q    "On May 26, 2009, at approximately 3:02, Special Agent

7     Scott Francis observed Corredor arriving in the area of 8717

8     Kentucky, Kansas City, Missouri.  Corredor was driving a 2003

9     Ford conversion style minivan displaying Missouri license

10    plate, MD3 E4K.  Based on previously intercepted calls between

11    Corredor and Dunn, Dunn recently turned this vehicle over to

12    Corredor in an attempt to partially satisfy a drug debt owed

13    to Corredor."  Did I read that correct?

14    A    Yes.

15    Q    And there is no mention of the Corvette anywhere in

16    there, is there?

17    A    No, sir.

18    Q    Let me -- would it refresh your -- for identification

19    this is part of Exhibit 45.  I'm going to take a couple pages

20    out of the transcript from the criminal trial and hand a copy

21    --

22          MR. BOHLING:  Is this Mr. Corredor's testimony?

23          MR. CARPENTER:  It is.  And if I can approach the

24    witness?

25          THE COURT:  Yes.

1    BY MR. CARPENTER:

2    Q    Would it refresh your recollection of Mr. Corredor's

3    testimony at the criminal trial if I were to show you an

4    example of his testimony about what vehicles he owned?

5    A    Sure.

6    Q    And this is Pages 559 to 560, if you could take a look

7    at the bottom of Page 559 --

8              THE COURT:  What are you using this for?

9              MR. BOHLING:  Yeah.

10             MR. CARPENTER:  To show that Mr. Corredor testified

11   at trial when they asked him about his vehicles --

12             THE COURT:  Okay.  I thought part of this is you are

13   getting on the government for doing the very same thing that

14   you are asking to do now.  You're saying everything they would

15   submit, if they were using that testimony, would be hearsay,

16   Your Honor.  They shouldn't be able to do it, they shouldn't

17   be able to bring it forward because that person is not here.

18             MR. CARPENTER:  I'm refreshing his -- I'm sorry.

19             THE COURT:  No, no, no.  That's semantics.  That is

20   totally -- you're asking him to rely upon that to make some

21   determination on what this individual said.

22             MR. CARPENTER:  I'm trying to refresh his

23   recollection.

24             THE COURT:  No, no.  I'm going to hear every bit of

25   this distinguishing.

1          MR. CARPENTER:  Sure.

2          THE COURT:  You're going to ask him to read from

3     that testimony?

4          MR. CARPENTER:  I'm going to ask if that refreshes

5     his recollection?

6          THE COURT:  As to what?  What?

7          MR. CARPENTER:  As to what Mr. Corredor testified.

8          THE COURT:  Okay.  What he testified to is what?  If

9     they are going to ask him -- if you go open this door, I'm

10    going to let him do it, I'm going to allow them to open that

11    door.  Okay.  I'm going to allow them to same opportunity.

12    You can shade it how you want.  I'm going to allow it.  You

13    can make your objections.  I'll tell you that right now.

14         MR. CARPENTER:  I will withdraw that.  Withdraw,

15    Your Honor.

16         THE COURT:  It's withdrawn.

17         MR. CARPENTER:  Nothing further.

18         THE COURT:  Okay.  Thank you.

19         MR. BOHLING:  Just like two --

20         THE COURT:  No, two bites at the apple.

21         MR. BOHLING:  Okay.  I understand.

22         THE COURT:  Special Agent King, I appreciate it, you

23    can stand down, sir.

24         Two bites at the apple, that's it.

25         MR. BOHLING:  Thank you, Your Honor.

1          THE COURT:  Any further evidence from the

2     government?

3          MR. BOHLING:  So we do have Agent Casner here.  The

4     only thing she would do is she was present for the Corredor

5     proffer that we just heard about.

6          THE COURT:  Would that be any different arguable in

7     your opinion?

8          MR. BOHLING:  In my opinion it would not.  The only

9     difference is he did object to the fact that the agent wasn't

10    there.  That is only difference in the chain.  Otherwise I

11    would proffer to you that she is going to say that the proffer

12    statement from Mr. Corredor is exactly the same.

13         THE COURT:  I know it wouldn't change your opinion

14    on that.  Do we need to hear from her?  I think you would make

15    the same argument.

16         MR. CARPENTER:  Yes, I would make the same argument.

17         THE COURT:  Okay.  Whether she is here or not?

18    Okay.

19         MR. BOHLING:  In that case, Your Honor, we rest at

20    this point.

21         THE COURT:  Mr. Dwerlkotte, what do you have, sir?

22         MR. DWERLKOTTE:  Your Honor, at this point I think

23    we would -- one of the reasons we made such a big deal of the

24    CAFRA applying versus Rule 41.  CAFRA, Your Honor, would have

25    to make a determination under 983 if the government has met

1    its burden.  If it has, then it would shift back to us.  So

2    I'm a little reluctant to put Mr. Dunn on or anybody else on

3    subject to cross-examination for credibility determinations

4    when we can't do the same.

5              THE COURT:  You know, procedurally, how are we

6    bringing this?  You say that, and I understand what you're

7    saying because -- but how are we bringing this.

8              MR. CARPENTER:  I don't think there is any doubt

9    that CAFRA would have to apply.  So I don't know how -- the

10   burden either way, even under Rule 41, the burden would go

11   from the government in the event that Your Honor found that

12   their burden had been met, then would shift back to us.  Under

13   either scenario there is still a burden shifting here.

14             THE COURT:  Well, then I should hear the evidence?

15   What are you asking -- tell me --

16             MR. CARPENTER:  -- I'm asking you to make a

17   determination if the government has met its burden to

18   establish whatever burden is that they think that they have.

19   I think it's CAFRA.  Preponderance of the evidence, that it

20   was substantial connected to narcotics trafficking.  I'm not

21   sure exactly what the government's position is on Rule 41?

22             THE COURT:  What's the burden on Rule 41?

23             MR. BOHLING:  I think in this case I would accept

24   that the burden is preponderance, and that it would be our

25   burden to show by preponderance of the evidence that this was

1    connected to narcotics trafficking.  Either as proceeds or as

2    facilitating property which is a very important concept in

3    this case.

4            However, I don't think it is incompetent on the

5    Court to make any determination at this point under either

6    scenario.  This cannot be a CAFRA case, we did not file a

7    civil forfeiture complaint.  There is no civil forfeiture on

8    file.  Ultimately from our burden of proof, I don't think it

9    makes any substantial difference.  It's preponderance.  We

10   bear it.

11           THE COURT:  It makes no difference.

12           MR. BOHLING:  It makes no difference.

13           THE COURT:  Help me.

14           MR. DWERLKOTTE:  I don't think you can say that the

15   preponderance of the evidence standard applies when it's Rule

16   41.  CAFRA has to apply.  And that's what the standard is

17   under CAFRA so we apply that standard.  And if the government

18   -- an the reason this is important, Your Honor, is there is

19   cases we have cited in our trial brief, that we don't have to

20   do anything.  If Your Honor finds that the government hasn't

21   met its burden, it doesn't shift, it's over, we win.  So

22   that's why --

23           THE COURT:  Well, whether it's under Rule 41 or

24   under CAFRA?

25           MR. DWERLKOTTE:  No, under CAFRA, Your Honor.  I

1   would argue it's the same thing under Rule 41.  Functionally,

2   I think, we have a stipulation that the cars were registered

3   in Mr. Dunn's name.  So I think that alone gives us the

4   sufficient property interest which would trigger the

5   government's burden.

6          In any event, I think you still have an obligation

7   to decide if the government has met its burden before we

8   decide whether or not we put Mr. Dunn on the stand.

9          THE COURT:  I'm a bit confused.  So if I feel I bit

10  confused, let me tell you how I feel I'm going to address

11  this.

12         MR. DWERLKOTTE:  Absolutely.

13         THE COURT:  I'm going to address it like I would any

14  other time like I would if I was trial.  Because you're asking

15  me to make some judgment at the close of the -- what I'm

16  hearing, at the close of the government's evidence.  And at

17  this point in time I'm not prepared to say to you that they

18  have not met their burden.  If you've got evidence on you're

19  going to put it on.  My intention of this is to hear what you

20  have.

21         Those things that you believe that the Court

22  shouldn't consider, then the Court will have the opportunity

23  to review any subsequent motions filed.  Whether I should

24  consider this on the outset.  Right now I need everything that

25  I need to make a decision.  I understand what you're saying,

1   but I understand.  But I need to hear the evidence.  It's your

2   call.

3            MR. DWERLKOTTE:  And would it be possible if we can

4   take a small lunch break so we can make that determination?

5            THE COURT:  Yeah.  And we can break.  And I

6   understand what you're saying, but I think it puts the Court

7   -- what I'm trying to do and what I thought we were trying to

8   do, kind of to the best we can to deal with this in one

9   setting, right?

10           MR. DWERLKOTTE:  Sure.

11           THE COURT:  But you're asking me to make a decision

12  now preponderance so you don't have to put -- and I'm not

13  prepared to do that.

14           MR. DWERLKOTTE:  And that's fair, Your Honor.  I

15  think what we'll do if we can do is have a small lunch break.

16  If we agree to put Mr. Dunn on, we'll go through his business

17  records and things like that, and I think that will be all we

18  do.

19           MR. CARPENTER:  And I have one wrinkle too.

20           THE COURT:  Sure.

21           MR. CARPENTER:  Your Honor, is right that our

22  position is the transcript pages shouldn't come in.  If they

23  do come in -- which is why we haven't offered any.  We haven't

24  designated any the way the government has.

25           If Your Honor thinks they do come in, we would

1     designate a couple to defend ourselves.

2             THE COURT:  I don't think -- here's what I did.  I

3     thought the government was not putting any in?

4             MR. BOHLING:  I have not offered those.

5             THE COURT:  He has not offered because it was

6     problematic when we started the hearing.  And I believe and I

7     believe that no matter how thin we are going to slice it, that

8     the distinction was the distinctions without any -- in my

9     opinion.  I don't think the government is going there, are

10    you?

11            MR. BOHLING:  No, Your Honor.

12            THE COURT:  I think that is an issue that we can put

13    to bed.

14            MR. CARPENTER:  And we won't designate anything else

15    either.

16            THE COURT:  Okay.  All right.

17            I guess, you know, I'm willing -- and I understand

18    what you're struggling with.  That's why my question was what

19    am I hearing?  You believe it should be this type of case?

20            MR. DWERLKOTTE:  Absolutely, Your Honor.

21            THE COURT:  But they haven't brought that.

22            MR. DWERLKOTTE:  But we haven't brought a Rule 41

23    either.

24            THE COURT:  Right.

25            MR. DWERLKOTTE:  Right.

1          THE COURT:  So what you're saying is this, they

2     have.  They brought a 41 and you're saying this is not a 41

3     hearing?

4          MR. DWERLKOTTE:  They've asked for a Rule 41 type

5     hearing.

6          THE COURT:  Right.

7          MR. DWERLKOTTE:  Right.

8          THE COURT:  So logically, work with me.

9          MR. DWERLKOTTE:  Yes.

10          THE COURT:  Is if at some point -- I heard your Rule

11     41 -- you can call it what you want, I heard evidence.

12          MR. DWERLKOTTE:  Right.

13          THE COURT:  If I go with you and I don't believe

14     this is a Rule 41 type hearing, that's it.

15          MR. DWERLKOTTE:  Right.

16          THE COURT:  It's not a Rule 41 type hearing.

17          MR. DWERLKOTTE:  That's correct.

18          THE COURT:  So when I make a decision and I set

19     aside the forfeiture, set it aside, then we are Ground Zero,

20     right?  Okay.

21          MR. DWERLKOTTE:  Well.

22          THE COURT:  No, please don't make it difficult.  If

23     I don't think this is a Rule 41, you win, right?  But then I

24     set aside the administrative forfeiture, right?

25          MR. DWERLKOTTE:  Right.

1          THE COURT:  So it's not a Rule 41, I set aside the

2    administrative forfeiture, so then we just have them with his

3    property with nothing to forfeit it.  That was your argument

4    to me.

5          MR. DWERLKOTTE:  That's fair, Your Honor.  I don't

6    want to complicate it.

7          THE COURT:  It's your argument.  So therefore, give

8    it back.

9          MR. DWERLKOTTE:  Right, right.

10          THE COURT:  That's what I'm saying.

11          MR. DWERLKOTTE:  That's what I'm saying.

12          THE COURT:  Okay.  You're weren't.  You were arguing

13    with me.

14          MR. DWERLKOTTE:  I misunderstood.  I apologize.

15          THE COURT:  Okay.  I'm going to listen to it, I may

16    decide it's not a Rule 41.  Or I can decide it is a Rule 41

17    and they haven't met their burden.  And if they haven't met

18    their burden, which is preponderance, which we both agree

19    would be in both cases, you win again.

20          MR. DWERLKOTTE:  Right.

21          THE COURT:  Then we have to worry about if they

22    haven't met their burden, then we have to worry about how do

23    we have these assets or this property that's been -- and then

24    we get to the other stuff.  And I think that's it?

25          MR. DWERLKOTTE:  Right.  I think that's right.  My

1    only fear was there could be testimony that we can't un-ring

2    once it comes out if it happens on cross-examination.  So you

3    are going to have testimony from Mr. Dunn, but no testimony

4    from anybody else.  So that was my only concern.

5              THE COURT:  That is your -- that's your strategy to

6    determine how you want to present this evidence.

7              MR. DWERLKOTTE:  Right.

8              THE COURT:  That's on you.  That is not on the

9    Court.

10             MR. DWERLKOTTE:  Right.

11             THE COURT:  And if you do it and you open door, so

12   be it.

13             MR. DWERLKOTTE:  Right.

14             THE COURT:  That's part of litigating matters, I

15   guess.  I can't help you there.

16             MR. DWERLKOTTE:  I agree.

17             THE COURT:  So that's that I'm saying.  So I

18   understand what you're saying.  But I think either way this

19   matter can be resolved today.  And I think even counsel said

20   he may agree with you on the hearsay.

21             MR. BOHLING:  I would like to consider that.

22             THE COURT:  He may.  Because I'm leaning heavily in

23   terms of whether that even comes in in your favor.  We'll see.

24             MR. DWERLKOTTE:  Okay.  I think that's it.

25             THE COURT:  So I'll give you 45 minutes for break.

1    We'll come back at 1:15.  You'll tell me what you want to do.

2    We'll make some arguments if need be.

3              This is a little different.  And I understand it is

4    complex in a lot of ways.  And I know you don't want to put

5    yourself in a position that you can't get out.

6              MR. DWERLKOTTE:  Right.

7              THE COURT:  And I'm not trying to get you there.

8              MR. DWERLKOTTE:  I just need a second to go over

9    some things with counsel.

10             THE COURT:  Okay.  So I'll stop firing questions at

11   you.  See you at 1:15.

12   (THEREUPON, a short recess was had; WHEREUPON, the following

13   proceedings were had.)

14             THE COURT:  Mr.Dwerlkotte?

15             MR. DWERLKOTTE:  We decided not to call Mr. Dunn.

16   So I guess we will rest.

17             THE COURT:  Okay.  Great.

18             How would you like the Court to proceed?

19   Mr. Bohling, I thought you may have suggested that you want to

20   brief something or you all tell me?

21             MR. BOHLING:  I would be happy to give a

22   post-hearing brief given the complexity of the issues.  Some

23   of this is a little different -- and I think both of us would

24   say this, perhaps have gone a little differently than we

25   anticipated.  I think very important issue of is this a Rule

1  41 hearing?  Is it something else?  I do think that is

2  substantively important.

3            THE COURT:  Because a Rule 41 hearing would require

4  this Court what?

5            MR. BOHLING:  I think --

6            THE COURT:  I want you guys to make that

7  distinction.  A Rule 41 as opposed to?

8            MR. BOHLING:  I don't think it can be anything else.

9            THE COURT:  Okay.  And Dwerlkotte is saying, this is

10  not a Rule 41.  This is, if anything, would have to be under

11  CAFRA.

12            MR. DWERLKOTTE:  Yes, Your Honor.

13            MR. BOHLING:  And my position is it simply cannot

14  be.  We have never filed a civil proceeding.  We probably

15  can't because of the statute.  So my position is it cannot --

16            THE COURT:  -- because if I find Mr. Dwerlkotte

17  correct, this is not a Rule 41, I mean, if I can answer that

18  critical question, would you agree and I make a determination

19  this isn't, and I know you're saying, well, Judge it is, then

20  would you agree that -- and I keep saying Ground Zero.  If I

21  vacate, which I'm going to vacate.  That's one thing we know.

22  I'm going to vacate the administrative forfeiture.  That will

23  put us -- and if I don't see this as a Rule 41 hearing, that

24  puts us at now we just have property that the government has

25  that is Mr. Dunn, if I find that, would you agree?

1          MR. BOHLING:  So there are two aspects to that

2    question that are very different from each other.  And that is

3    can it be a Rule 41 hearing legally?  That's one question that

4    I think that they are raising.  Which is an interesting

5    question.  And I think that we are into this area where this

6    is not entirely clear.  I have cited some case law and I think

7    that we might benefit from more discussion with that issue.

8          There is another way to look at it and I think it is

9    confusing.  But I think that the question becomes not can it

10   be, but is it?  So in other words, the Court has not entered

11   its order on the -- yet, we know and conceited that you

12   should, vacate the administrative forfeiture.

13         THE COURT:  Can I do so on the record now and I'll

14   follow up with the Court's written judgment?

15         MR. BOHLING:  I have no objection to that.

16         THE COURT:  I mean, if I can do it on the record the

17   Court will set aside and vacate the administrative forfeiture

18   with respect to this -- the property.  I mean, I can do it and

19   follow up with a Court's order doing so.  So we don't have to

20   talk about it.  All the parties agree and stipulate that the

21   Court should vacate and set aside the previous administrative

22   forfeiture?

23         MR. BOHLING:  Yes.

24         THE COURT:  Okay.

25         MR. BOHLING:  Yes.  I think a written order would e

1    appropriate.

2           THE COURT:  Well, I'm doing oral.  And now I have

3    done that and now we are back to?

4           MR. BOHLING:  Right.  So then question becomes, we

5    are sitting with $41,000 dollars, we do not have the cars.  So

6    then what happens?  In our view 983 does not answer that

7    question.  It has to be answered by some other procedure.  We

8    would agree that in the abstract that procedure would be to

9    file a civil forfeiture complaint.  But in the event our

10   statute of limitations has run and they have indicated they

11   are not -- and quite understandably not going to waive their

12   statute of limitations defense.  So we, I think, would agree

13   that that is not a viable course of action for the government.

14   So then the question becomes again we're sitting with this in

15   our view the proper next step then is for Mr. Dunn to file a

16   Rule 41 if he wants the property to be returned.  Remember

17   that we cannot return the cars because we do not have them.

18   So that's not an option.

19          THE COURT:  Let me ask you this, who has to initiate

20   this, does Mr. Dunn initiate it or does the government?

21          MR. BOHLING:  Mr. Dunn.

22          THE COURT:  Now, for purposes of this Rule 41

23   hearing, you want to Court to make a determination that his

24   previous filings albeit preempted this kind of this stage we

25   are at now because we never have set aside other than right

now, I need to treat his prior motions as a Rule 51 requesting

property back?

MR. BOHLING: So I was under the impression that,

that we were somewhat agreeing on that before hand. And now

it's clear to me perhaps we're not agreeing.

THE COURT: Agreeing that?

MR. BOHLING: That it would be appropriate to go to

the next step and have a hearing that would be one under

Rule 41 for this determination. Because that is what I had

said in my pleading that we were going to do. And that was

based upon the fact that Mr. Dunn had filed previous Rule 41

motions.

THE COURT: Those Rule 41 or should they loosely be

interpreted as Rule 41?

MR. BOHLING: I certainly saw them as being fairly

interpreted. I think he used the words Rule 41 at some point.

THE COURT: Okay.

MR. BOHLING: There is a lot of prior litigation

here.

THE COURT: Okay.

MR. BOHLING: And I thought -- I didn't want to put

him to the extra procedural step of having to refile that

again given that he had already indicated his intention to do

so. That was my thought about the whole thing.

THE COURT: Okay. Fair enough.

1          MR. BOHLING:  But I don't want to speak for Mr. Dunn

2    in terms of -- it's his choice about how he wants to proceed.

3    My argument is and this is something I think we do want to

4    brief for the Court, is if he doesn't do that, we're not

5    obligated to do anything at this point.  Even though you have

6    vacated the forfeiture.  Again, I have two cars I can't get

7    back.  There is a whole other piece to this that we have to

8    get through at this point.

9          THE COURT:  What if I did do that and you did have

10   two cars?  Let's say, hypothetical -- you're saying I don't

11   have to give back.  What if we had two cars, two cars and

12   $41,000 dollars and we are postured like we are now?  In that

13   if I interpret it and Mr. Dunn says that wasn't a Rule 41, I

14   was asking it back, and you have property, and I set aside

15   this administrative forfeiture, then you just have property?

16         MR. BOHLING:  Right.

17         THE COURT:  And that goes back to what -- then it's

18   still Mr. Dunn's?  Or whose is it?

19         MR. BOHLING:  Our argument would be that Rule 41 is

20   the proper and recognized for him to get the property.

21         THE COURT:  And where we are right now is just kind

22   of be sitting unless and until he makes a motion.

23         MR. BOHLING:  My view of the law is that there is

24   still substantive law that says that the United States

25   property right rest at the time of the offense.  So

1  notwithstanding what has happened with the forfeiture or not,

2  that still exists.  And so our position is we still have the

3  right to say to Mr. Dunn, we believe that you do not have an

4  equitable right to request this back.  So I think he would ask

5  for it back, we would say we think this is property involved

6  in your offense of conviction, we don't think we should give

7  it back.  You need to file a Rule 41 and let the Court decide

8  this.  That would be our position.

9            THE COURT:  What would you do otherwise with it?

10  Say if Mr. Dunn never asked it, what would you do otherwise?

11  Is there some statute or something that says, well, if they

12  don't claim -- so you're almost forcing them to use the Rule.

13  They have no other recourse other than, if that's the case

14  then why are we -- it seems to me that you can take it, it's

15  like a taking of someone's property.

16            MR. DWERLKOTTE:  It is.

17            THE COURT:  Albeit, it's taking of someone's

18  property, albeit, there is a criminal case arguably that you

19  suggest, well, this property is related to this criminal

20  activity, but you have filed nothing.  There is nothing out

21  there that suggests or makes that connection where you should

22  forfeit it based upon the crime.

23            MR. BOHLING:  Right.

24            THE COURT:  But because I collected it in the course

25  of this investigation, that it is fine.  Or you have taken the

1    property and now you're gonna -- they should be able to get my

2    property back.

3            MR. BOHLING:  I see the issue being a little bit

4    more discreet than that.

5            THE COURT:  No listen here.  I've had cases where

6    there is property.  Albeit, it's not $41,000 dollars and not

7    two vehicles, but I think the premise is the same.  That the

8    law enforcement agency or whoever, the government had this

9    property.  And they requested the property back.  They didn't

10   do the Rule 41, and then I said, well, let's check with the

11   AUSA.  We don't need have.  And so the Judge, what I did is

12   issue an order that you give them their guns back.  It was

13   guns.  Now, I made them sell it in six months at an auction,

14   but the point is you have instituted nothing which to suggest

15   that you had some right or it was forfeited.  There is no

16   action.  So now is this different?

17           MR. BOHLING:  It's different -- and I'm often the

18   ones dealing with those issues even if behind the scenes.

19           THE COURT:  Is it value?

20           MR. BOHLING:  Part of it is value.  Part of it is

21   the fact that there was a criminal conviction for a drug

22   conspiracy.

23           THE COURT:  Well, I had a criminal conviction for

24   these guns too.  There was a conviction.  So you know, felon

25   in possession.  And that's a little different, but the point

1    is I had a conviction, I had the gun, I had property.

2            MR. BOHLING:  I don't recall that case in

3    particular.

4            THE COURT:  Brandwine.

5            MR. BOHLING:  I think one of the differences maybe

6    that if there are third parties that are involved then

7    everything is different, right?

8            THE COURT:  That's true.

9            MR. BOHLING:  That's the issue.  See that's what I'm

10   trying to say is I think the law says notwithstanding anything

11   else, if you're a person who like Mr. Dunn is eventually

12   convicted of a crime, if the property is involved with the

13   crime then you kind of lose equitable title to that at the

14   time that you commit the offense.

15           If there were a third party here, if there were

16   somebody else out there that I am aware of who had a good

17   faith basis for making the claim, we would be in a completely

18   different situation.  And often are.  So I think some of those

19   differences would be explained by that.

20           THE COURT:  I guess I'm having problems with when

21   you're saying that this -- what was seized was part of the --

22   I don't know.  Has anyone made some determination to law

23   enforcement?  Because sometimes in collection of evidence, I'm

24   collecting evidence and doing all and this is part of it.

25           MR. BOHLING:  Right.

1          THE COURT:  I suggest that it's part of the fruits

2   of his criminal activity.

3          MR. BOHLING:  And that was the purpose of today's

4   hearing.

5          THE COURT:  It's the assumption that it is.  Unless

6   and until Mr. Dunn files a 41 motion to suggest that it is

7   not.  Because if we are back to Ground Zero right now which we

8   are, you have $41,000 dollars, you don't have the vehicles,

9   but you have $41,000?

10          MR. BOHLING:  Correct.  And so we are looking at it

11   from the other side of the coin.  The other side of the coin

12   is that we believe -- and we would present evidence to you

13   today, of course, that would be ultimately for the Court's

14   determination.  But that $41,000 dollars is either the

15   proceeds of or facilitating of drug trafficking.

16          THE COURT:  And that is only if the Court interprets

17   that Mr. Dunn's previous filings were requested back under

18   Rule 41.  If he wasn't or he has not filed it, then we don't

19   have a Rule 41 hearing, we just have the government with

20   $41,000?

21          MR. BOHLING:  Right.

22          THE COURT:  And you say I get to keep it unless

23   Mr. Dunn files a Rule 41 to reclaim?

24          MR. BOHLING:  You're right about that.  But I will

25   amend that characterization just a bit from my perspective.

1          THE COURT:  Okay.

2          MR. BOHLING:  In my world what I'm saying is $41,000

3     dollars in drug proceeds and I shouldn't be giving it back to

4     Mr. Dunn who has been convicted of drug conspiracy that he has

5     no equitable right to its return.

6          THE COURT:  But don't you have to show it?

7          MR. BOHLING:  Right.  And the procedural way I can

8     do that is by saying to Mr. Dunn you need to file a Rule 41

9     motion.

10          THE COURT:  And if he doesn't file the Rule 41 then

11     the $41,000 just sits indefinitely?

12          MR. BOHLING:  Right.

13          THE COURT:  We just wait him out and they don't do

14     it and then it's a taking.

15          MR. BOHLING:  Well, there are abandonment

16     proceedings.

17          THE COURT:  Okay.

18          MR. BOHLING:  You're right.  It's a fair

19     characterization.

20          THE COURT:  I appreciate it.  I know this is your

21     area, but, yeah, you're right, that other case Brandwine was a

22     third party so that takes it off the plate.

23          MR. BOHLING:  Right.

24          THE COURT:  I understand what you're saying.  I cut

25     you off.

1          MR. BOHLING:  No, Your Honor.

2          THE COURT:  I'm trying to get to the point where I'm

3     understanding and I think I do.

4          MR. BOHLING:  It's it is very interesting

5     discussion.  I think it has been incapsulated perfectly well.

6     And I think we cited cases that the support the position.

7          THE COURT:  Mr. Dwerlkotte?

8          MR. DWERLKOTTE:  On the Rule 41 point, again, I

9     think we've gone through, we've gone through the

10    administrative process.  We know that they can't file the

11    civil forfeiture.  And we know that they did in the criminal

12    case filed the forfeiture, but never submitted on it.

13         So the only three recognized way that they get to

14    just keep property, they haven't done.  So those three

15    avenues.

16         THE COURT:  What are those three avenues again?

17         MR. DWERLKOTTE:  The administrative, which we agreed

18    to set aside.

19         THE COURT:  Right.

20         MR. DWERLKOTTE:  The criminal which they included

21    but didn't submit to the Jury.  And then the civil forfeiture

22    --

23         THE COURT:  Which we agree the statute of

24    limitations probably has run?

25         MR. DWERLKOTTE:  Sure.  Right.

1          THE COURT:  So I just want to guide this

2     conversation.  So Mr. Bohling is saying, with that said, we

3     can keep the money until such time that Mr. Dunn files a

4     Rule 41.  That is the procedure in which -- then we have this

5     hearing, then the Court makes a determination to see if it's

6     actually related and has the government met their burden.

7          MR. DWERLKOTTE:  Right.  And so I would say that

8     under the Eighth Circuit law, if there's a void administrative

9     forfeiture like in Volanty case that I cited to you early, the

10    Court ordered one of two things.  The return of the property,

11    give it back or you institute civil proceedings.

12         THE COURT:  Who institutes?  They do?

13         MR. DWERLKOTTE:  Right.

14         THE COURT:  We already know they can't.

15         MR. DWERLKOTTE:  Right.  So how is that our fault?

16    Why do we have to go file a Rule 41 motion to come back and do

17    this all over again when they are going to say the same

18    standard applies.

19         THE COURT:  Here is the rub for me.  Is it true that

20    you can just have property that you haven't instituted a way

21    of forfeiting because you believe it may be related to

22    criminal activity, right?  There is some nexus, therefore, we

23    can just have it.  I'm not saying that's right.  I'm just

24    saying what Mr. Bohling said, that they can just keep it

25    indefinitely.  That's what he is saying unless there is an

1    abandonment issue.

2           MR. DWERLKOTTE:  I think that the statute 983 spells

3    it out.  It's very clear.  If you don't do the notice right,

4    you give the property back and then you can institute new

5    proceedings.  It doesn't say that if the government can't do

6    any of these three ways, that Mr. Dunn has to go file the 41

7    motion.  It's offensive to due process to suggest that they

8    haven't done anything they are supposed to do, and that now

9    Mr. Dunn is supposed to do something that he shouldn't have to

10   do in the first place.

11          THE COURT:  I think there is the research to tell me

12   that.  And you believe you've given me the case law to support

13   that?

14          MR. DWERLKOTTE:  Yes, Your Honor.  Between Volanty

15   and the statute itself, Your Honor, I think it is pretty

16   clear.

17          THE COURT:  I've heard the evidence for the Rule 41

18   so I'm okay there.  I think my issue is if I determine that

19   this wasn't Rule 41, because your argument Mr. Dunn requested

20   this and that's how we have a hearing, correct?  Would you

21   agree with that?

22          MR. DWERLKOTTE:  I think the proceeding is

23   functionally the same.  I think we would do the same thing in

24   either hearing.  It's just whether or not the rules of

25   evidence are going to apply.  I think the functional hearing

1   isn't going to be any different, Your Honor.  And that's why

2   we have this difference of opinion on how the proceeding would

3   play out in terms of evidence and everything.  So I think the

4   standard is the same regardless of Rule 41 or CAFRA.

5          THE COURT:  Why do you keep saying CAFRA?  This is

6   not that.

7          MR. DWERLKOTTE:  I think it is governed by CAFRA

8   because once they set that aside and they have instituted the

9   administrative forfeiture process it therefore becomes civil

10  forfeiture and CAFRA applies.

11         THE COURT:  Okay.  But I guess my point is this, I

12  understand you treat it at least evidentiary wise, I think,

13  the same, right?  So are you conceding the fact that the prior

14  filings by Mr. Dunn, those prior filings were requesting

15  property back which arguably it would be Rule 41?

16         MR. DWERLKOTTE:  I haven't looked at those, Your

17  Honor, so I don't know.  I can't say.  I don't doubt the

18  characterization that there were probably Rule 41 type

19  motions.

20         THE COURT:  Well, then why isn't it a Rule 41 here?

21  That's why we are here then?

22         MR. DWERLKOTTE:  Because Rule 41 isn't the

23  appropriate -- this is very nuanced area.  Rule 41 doesn't

24  apply.  Your Honor, I think it would be an issue as an issue

25  of law.  This is not an equitable circumstance for to you

1    exercise jurisdiction under Rule 41 when the law, the Eighth

2    Circuit law, the statute tells you to order the government to

3    either give it back or institute the proceedings.

4            THE COURT:  The only way it would be equitable if I

5    didn't set aside the administrative forfeiture and then we

6    file Rule 41 equity that say, Judge, maybe they get to keep

7    that stuff, but this stuff over here wasn't part of this

8    criminal activity, therefore, we have a hearing, they have to

9    meet their burden, that is what you're saying?

10           MR. DWERLKOTTE:  Exactly.

11           THE COURT:  Because the difference here is you did

12   set it aside, Judge, therefore, we never get to 41.

13           MR. DWERLKOTTE:  Exactly.  I completely agree.

14           THE COURT:  I'm not saying it as a fact, I'm just

15   following your argument.

16           MR. DWERLKOTTE:  No, I agree with you whole

17   heartedly.  It's that specific piece that is the linch pin

18   there.

19           THE COURT:  Okay.

20           MR. DWERLKOTTE:  I think that some of the case law

21   that Curt is talking about I think are -- again, I think those

22   are pre-CAFRA cases that talk about this equitable idea of

23   returning property because there was a -- you're not going to

24   want to hear this, but there is a Circuit split.  The Tenth

25   Circuit came up with this equitable doctrine --

1              THE COURT:  -- who did?

2              MR. DWERLKOTTE:  The Tenth Circuit.  I know you are

3    in the Eighth Circuit.

4              THE COURT:  What did the Eighth Circuit say?

5              MR. DWERLKOTTE:  The Eight Circuit said, the Volanty

6    case, says if you do it wrong, you give it back or you

7    institute the proceedings.

8              THE COURT:  And the Tenth Circuit said what again?

9              MR. DWERLKOTTE:  Tenth Circuit came up with this

10   equitable doctrine of unclean hands and said well, you're not

11   just going to get the property right of way in the event you

12   are convicted.

13             THE COURT:  Possibly suggesting that I don't have to

14   follow that.

15             MR. DWERLKOTTE:  You definitely do not have to

16   follow that and I would suggest that you don't.

17             THE COURT:  It's persuasive though, isn't it?

18             MR. DWERLKOTTE:  It is not.  The Eighth Circuit has

19   already said what you should do so it is not binding on you,

20   Your Honor.

21             THE COURT:  Is that Tenth Circuit?

22             MR. BOHLING:  I did cite some Tenth Circuit cases.

23   And Clymore is the main case that established it that is a

24   Tenth Circuit decision.

25             THE COURT:  Okay.

Denise Carroll Halasey CCR, CVR-CM

1          MR. BOHLING:  I think there are some of the

2     decisions in other circuits and district courts that follow

3     it.

4          Volanty I think is not quite -- first of all, I

5     think there is some later Eighth Circuit case law that would

6     kind of suggest that that is not quite right, including Hall,

7     which I cited to you.  But Volanty is a case where basically

8     they're saying file the civil forfeiture case.  Which we would

9     love to do.  Believe me, I would love to file a civil

10    forfeiture case, I can't.  So Volanty is in a circumstance

11    that does not apply with us.

12         Clymore, the Tenth Circuit case, does address our

13    facts which is we are behind the statute of limitations.  And

14    there is a whole line of cases that address that and talk

15    about the Rule 41 issue in that context.

16         THE COURT:  Okay.  Good.  And what is that case

17    again?  I know you cited it in your briefing.

18         MR. BOHLING:  Clymore, that's C-L-Y-M-O-R-E.  And

19    there is a Clymore 1, and a Clymore 2.

20         THE COURT:  And that's Tenth Circuit?

21         MR. BOHLING:  That's Tenth Circuit.

22         THE COURT:  To your point why when they're saying

23    the Eighth Circuit, hey, that's great, but we are beyond that.

24         MR. BOHLING:  Right.  And we cited both in what we

25    filed yesterday, one of my initial filing that I referenced I

1    think it was Document 14 a while ago.  We cited a different or

2    newer case than what I did yesterday.

3              THE COURT:  Okay.

4              MR. BOHLING:  But there is a whole lot of cases that

5    follow that reasoning.

6              THE COURT:  Okay.  Go ahead.

7              MR. DWERLKOTTE:  Well, I would -- I think this is

8    the important distinction, Your Honor.  So I think in footnote

9    3 of Clymore, 245 F.3d 1195, this is dealing with pre-CAFRA

10   case.  Footnote:  "Congress has now expressly declared if an

11   administrative forfeiture is judicially set aside for failure

12   to provide adequate notice to an alleged owner, the government

13   may commence a subsequent forfeiture proceeding as to the

14   interest of that claimant notwithstanding the exception of any

15   applicable statute of limitations."  983(e)(2)(a).

16             I think other exceptions apply in there why they

17   probably couldn't, I haven't done that research.  So I think

18   that those cases are all pre-CAFRA cases.  The statute

19   983(e)(2)(a) supersedes those and controls here.  Not any of

20   those that are applying pre-CAFRA case law.

21             MR. BOHLING:  I think that's an interesting point.

22   If we all agree that I can file a civil forfeiture action

23   tomorrow.  So that's the question.

24             THE COURT:  You're kind of hinting at it.

25             MR. BOHLING:  Right.

1          MR. DWERLKOTTE:  Well, I think there are probably

2    other provisions.

3          THE COURT:  I thought you would say, yeah, that

4    would be great, Judge, they can't do it because the statute of

5    limitations is over.  But you are not necessarily saying that.

6    I thought you would say that.

7          MR. DWERLKOTTE:  I'm saying that the statute --

8          THE COURT:  I would tell Mr. Bohling, go ahead and

9    file it.  I think your beyond your time.

10          MR. DWERLKOTTE:  That's my point.  The reason we had

11    this hearing then is to come in here and we're going to do the

12    same thing.  The functional difference of which one is

13    applying doesn't really matter.

14          I think there are two other provisions that arguably

15    would apply that say they can't and they have to give the

16    property back.

17          THE COURT:  Okay.

18          MR. DWERLKOTTE:  And they have to give it back

19    pending them deciding whether or not to bring a civil

20    forfeiture case.  So it's not well, we'll sit around and

21    figure it out, because that's what would then prompt us to

22    file a Rule 41 motion.

23          THE COURT:  Okay.  What do you all -- I just want to

24    be very clear too.  What are you briefing me, Mr. Bohling?

25          MR. BOHLING:  I would like to brief three topics.

1   One, is a brief review of the evidence on the case.  Actually,

2   I was thinking about some things over lunch.  There is some

3   very interesting evidence here that I would like to review for

4   the Court.

5          THE COURT:  Sure.

6          MR. BOHLING:  Number two, is I think very

7   interesting and I think very unsettled issue about what

8   happens now, now that the Court has vacated the administrative

9   forfeiture.  Is it Rule 41, is this a CAFRA hearing, do we get

10  to file a new complaint, how should that work?  Because I will

11  say honestly do this case law that it is less than clear to

12  me.  This is one of those areas of the law where it is rarely

13  tested and I want to make sure we are doing the right thing.

14         THE COURT:  Sure.

15         MR. BOHLING:  But I'd like to review those cases and

16  even took to Brent about them and make sure we are on the

17  right page there.

18         The third issue that I think is lurking here is the

19  one I've raised which is as to the cars.  I think the law in

20  the Eighth Circuit is clear that they cannot be ordered return

21  and therefore it's a damages type situation and what then has

22  to happen at that point.  Because I think we're kind of off to

23  the races on a third phase of this litigation.

24         THE COURT:  And then they would have to maybe file

25  some other type of action?

1          MR. BOHLING:  Unfortunately, yes.

2          MR. DWERLKOTTE:  Have to go to the federal claims

3    court actually.

4          MR. BOHLING:  And I will be perfectly honest, I've

5    talked to agency counsel and we would be very open to -- if

6    that's the situation, if that is what we are left with, we

7    certainly would be open to talking with these attorneys and

8    try to come to a resolution.

9          THE COURT:  Sure.  I'm sorry, Mr. Dwerlkotte.

10         MR. DWERLKOTTE:  Sure.  I was going to say the Rule

11   41 part just still doesn't make any sense because they can't

12   give us back the car.  Having a hearing for them to tell us

13   they can't give us the cars back, we already know that.  So

14   Rule 41 doesn't make sense.

15         THE COURT:  Well, what would we do if I say -- what

16   would we do if I ordered them to give what back?  What would I

17   order them?

18         MR. DWERLKOTTE:  That's my point.  The only thing

19   you can do under Rule 41 is give the property back, but since

20   they don't have the cars, you can't make that.  So we would

21   have a Rule 41 case where we can't do anything except maybe

22   the money.

23         THE COURT:  The money?

24         MR. DWERLKOTTE:  Right.  But regardless we would

25   still have to do a completely different case so the Rule 41

1    hearing does nothing to help us with the cars because they

2    have gotten rid of it.

3            MR. BOHLING:  It does in a real way, Your Honor.

4    There's a couple reasons why.  One is the Rule 41, if I'm

5    correct, and there's an equitable component to Rule 41, then I

6    think if a court were to determine that we did not have to

7    give the property back, you know, in theory, if we have it,

8    that there is no equitable -- that equitably we do not have to

9    do that, it moots out the rest of the issues.

10           The second reason is because under Hall, the Eighth

11   Circuit case that talks about this.  Hall says that Rule 41 is

12   not a damages provision, does not waive sovereign immunity.

13   But it also says that the filing of a Rule 41 essentially if

14   the government then, like we have here says this stuff is

15   gone, that then can go to the next phase of being a Federal

16   Tort Claims Act or whatever it would be.  And that's really

17   important because there is a statute issue on their side too.

18   So that gets rid of the statute issue.  The Hall finding, the

19   Hall case, the Rule 41 morphs into this next proceeding, it

20   gets rid of their statute issue.  So if they don't file a Rule

21   41, they are going to have the same issue I have on my side.

22           THE COURT:  Okay.  If I just stop and say an order,

23   give back the property, then that doesn't resolve this issue

24   with the cars.

25           MR. DWERLKOTTE:  We're back here right again.  And

1    that's my point is regardless of if CAFRA applies or not, if

2    Your Honor determines -- there is no way to determine this

3    equity component.  So that's why it all comes back to

4    substantial connection, the preponderance of the evidence

5    standard.  So if you, Your Honor, determine that they haven't

6    met their burden, then we can then go to the Court of Federal

7    Claims and either initiate a new case or, Your Honor, what I

8    would submit -- I haven't thought about the statute issue

9    there, we could then have Your Honor transfer the case.

10            THE COURT:  But wouldn't they give you back the

11    $41,000?  What would you go to the Federal Tort --

12            MR. DWERLKOTTE:  -- we would have to go to the

13    Federal Claims Court over the two cars, Your Honor.

14            MR. BOHLING:  The cars are worth more than $10,000.

15    So the jurisdiction is exclusively with the Court of Claims

16    under the Tucker Act if that is the way they want to go.

17            THE COURT:  But you're still saying you would do

18    that under 41 or no?

19            MR. BOHLING:  What I'm saying is and this is a

20    little convoluted.

21            THE COURT:  Lord.

22            MR. BOHLING:  The Eighth Circuit in Hall said

23    somebody like Mr. Dunn brings a Rule 41 action.  The

24    government says your stuff isn't here.  It happens.  The

25    Eighth Circuit says, and other court's agree with this, you

1  can't be ordered to return what you don't have.  So Rule 41

2  isn't the operative thing.  And Eighth Circuit says, and

3  there's a Circuit split on this issue, but the Eighth Circuit

4  says, and you cannot give damages directly under Rule 41.

5  What the Eighth Circuit then went on to say is by virtue of

6  filing the Rule 41 and discovering from the government that

7  they don't have the stuff, the Court, the District Court can

8  then take that Rule 41 motion and as he says essentially

9  convert it into a damages suit.  And that becomes important in

10  cases like potentially this one where there is a statue issue

11  on their ability to bring the civil damages suit.

12           THE COURT:  Oh.

13           MR. BOHLING:  Right?  Because it gets -- essentially

14  what the Court --

15           THE COURT:  -- that's why you are suggesting --

16           MR. BOHLING:  -- they have to do a Rule 41 if they

17  are going to get around the statute issue.

18           THE COURT:  Otherwise the statute of limitations

19  would preclude them?

20           MR. BOHLING:  Possibly.  I've not researched the

21  issue.

22           THE COURT:  Possibly preclude them.

23           MR. BOHLING:  I'm not saying that conclusively.

24           THE COURT:  Right.

25           MR. BOHLING:  It's been a long time, but there is

1    going to be an issue there.  Certainly one that I would

2    research.  So I'm not saying conclusively this is an issue or

3    I would raise it.

4            THE COURT:  For them getting into if it was towed or

5    not?

6            MR. BOHLING:  Right.

7            MR. DWERLKOTTE:  I wouldn't see a functional

8    difference I guess if it was -- even to the extent it was

9    construed as a Rule 41.

10           THE COURT:  It wouldn't be too much of a --

11           MR. DWERLKOTTE:  Well, why Your Honor couldn't then

12   just transfer the case administratively pursuant to statute

13   where they -- the Jackson case did exactly that.  The District

14   Court transferred the remaining claims under Rule 41 to the

15   Federal Claims Court for determination of damages.

16           But I guess that is kind of my point we shouldn't

17   have to do any of that stuff.  And now we are risking a

18   statute of limitation issue on something that we shouldn't

19   have to bring.

20           THE COURT:  Well, you would probably have some

21   pretty good arguments with respect to the statute.

22           MR. DWERLKOTTE:  Well, before we could even do that

23   though, we would still have to have Your Honor's determination

24   on the equity/whatever because that will be determined of all

25   of them.

1          THE COURT:  Right.  Well, did you want to submit

2    anything to the Court?

3          MR. CARPENTER:  In terms of a proposed order, Your

4    Honor?

5          THE COURT:  Yes.

6          MR. CARPENTER:  Yeah, we'd be happy to.

7          MR. DWERLKOTTE:  Proposed order to set aside the --

8    I can do that.

9          THE COURT:  Yeah, a proposed order of all this

10   stuff.

11          MR. DWERLKOTTE:  And any other evidence to provide

12   to Your Honor.

13          THE COURT:  That would be great.  And are you going

14   to send a proposed outside of your briefing?

15          MR. BOHLING:  I will be happy to do that.

16          THE COURT:  That would be great.  Well, I appreciate

17   it.  Longer than I thought but interesting.  A lot of

18   complexity to it.  Clearly, I'm trying to sort it out.

19          MR. DWERLKOTTE:  Like Curt said, it's not litigated

20   very often, we spent a lot of time looking into this.  It

21   doesn't happen very often.

22          THE COURT:  Yeah.  So let's get a date so we have

23   something on the calendar when these can be submitted.

24          MR. BOHLING:  How about Wednesday of next week?  Is

25   that good?

1        MR. DWERLKOTTE:  Can we do government submits and

2    then we respond?  Simultaneous briefing might be two sails

3    crossing in the wind.

4        THE COURT:  Okay.  You have till next Wednesday,

5    which is July 26th.  Mr. Dwerlkotte will have it 14 days and

6    then the reply is ten days, right?

7        MR. DWERLKOTTE:  14.

8        THE COURT:  To reply?  They need to change that law.

9        MR. BOHLING:  Your Honor, I'm happy to do it in ten.

10       THE COURT:  And then proposed judgments.

11       MR. DWERLKOTTE:  Are you wanting findings of fact

12   conclusions of law type judgment, Rule 52?

13       THE COURT:  Is there any other kind?  Yeah, I think

14   that would be good in light of the everything.

15       MR. DWERLKOTTE:  Can that follow the initial

16   briefing?

17       THE COURT:  You can get me back on and we can go

18   from there?  And then we can set a date.

19       MR. BOHLING:  That's fine.  What are you thinking

20   Brent?

21       MR. DWERLKOTTE:  Probably 14 days after that we can

22   start the next round.  Those just take a little bit of time.

23       THE COURT:  Yeah.  And that next round we just

24   submit.  So you're going to submit your proposed 14 days after

25   the reply?

1          MR. BOHLING:  19th was the last day, Your Honor.

2          THE COURT:  August 28th is the last day.  And so 14

3    days after that.

4          MR. DWERLKOTTE:  That's fine, Your Honor.  I might

5    need a little more time, but we can probably work together.

6    And just for the record, I love working with Curt.

7          THE COURT:  Well, let's say 14 days but if you need

8    more time, I've very open to that.

9          MR. BOHLING:  Thank you, Your Honor.

10         THE COURT:  We currently have the motion for hearsay

11   that is still --

12         MR. DWERLKOTTE:  That was more of a bench

13   memo/motion in limine so.  You can take under advisement.

14         THE COURT:  Right.

15         MR. BOHLING:  I moved on res judicata.  And I'm not

16   sure that is terribly relevant at this point but I would

17   address that in my briefing.

18         THE COURT:  I don't think you can argue that really.

19         MR. BOHLING:  The only point I was making is that

20   the existence of the conspiracy conviction.  But I think

21   within the context of the hearing it's not really an issue --

22   I think that is understood and it's not really an issue within

23   the fact finding.  But I will address it generally in my

24   briefing.  I don't think the Court needs to decide anything

25   right now.

1          THE COURT:  Okay.  Thank you all.

2          MR. DWERLKOTTE:  Just to make sure the proposed

3     findings, applicable with Rule 52.  I just want to make sure

4     I'm not missing something.  Proposed findings of fact,

5     conclusions of law, all that stuff?

6          THE COURT:  Right.

7          MR. DWERLKOTTE:  Just making sure.

8          THE COURT:  Yes.  Are we good?  Anything else?

9          MR. BOHLING:  No, Your Honor.

10         MR. DWERLKOTTE:  No, thank you.

11         THE COURT:  Okay.  Thank you counsel.  I really

12    appreciate it.

13    (THEREUPON, the following proceedings were adjourned.)

14

15                         CERTIFICATE

16

17         I certify that the foregoing is a correct transcript

18    from the record of the proceedings in the above-entitled

19    matter.

20
          August 26, 2017
21

22                    /s/ Denise C. Halasey
                      Denise C. Halasey, CCR, CVR-CM
23                    United States Court Reporter

24

25